**FOR PUBLICATION**

In the

# United States Court of Appeals

For the Eleventh Circuit

————————————————

No. 21-11416

————————————————

ARIEL MARCELO BASTIAS,

*Petitioner*,

*versus*

U.S. ATTORNEY GENERAL,

*Respondent*.

————————————————

Petition for Review of a Decision of the
Board of Immigration Appeals
Agency No. A074-344-653

————————————————

ON REMAND FROM THE SUPREME COURT OF THE
UNITED STATES

Before NEWSOM, MARCUS, Circuit Judges, and MIDDLEBROOKS,[*] DISTRICT JUDGE.

PER CURIAM:

This case is back before us for a second time, this go-round on remand from the Supreme Court.

In 2019, Ariel Bastias, a native and citizen of Chile and a lawful permanent resident of the United States, pleaded guilty to violating a Florida law that, in pertinent part, makes it a crime to "willfully or by culpable negligence neglect[] a child without causing great bodily harm, permanent disability, or permanent disfigurement to the child." Fla. Stat. § 827.03(2)(d). As a result of Bastias's plea, the government sought to remove him from the country pursuant to a provision of the Immigration and Nationality Act that, as relevant here, states that "[a]ny alien who at any time after admission is convicted of . . . a crime of child abuse, child neglect, or child abandonment is deportable." 8 U.S.C. § 1227(a)(2)(E)(i).

At Bastias's removal proceeding, the Immigration Judge held that his Florida conviction rendered him deportable because it qualifies as "a crime of child abuse, child neglect, or child abandonment" within the meaning of § 1227(a)(2)(E)(i) as interpreted by the Board of Immigration Appeals. The IJ separately denied Bastias's application for cancellation of removal.

---

[*] Honorable Donald M. Middlebrooks, United States District Judge for the Southern District of Florida, sitting by designation.

Bastias appealed to the Board of Immigration Appeals, which affirmed the IJ's decision. In likewise concluding that Bastias's child-neglect conviction constitutes "a crime of child abuse, child neglect, or child abandonment" for § 1227(a)(2)(E)(i) purposes, the Board explained that it had previously interpreted the statutory phrase "'crime of child abuse' broadly to mean any offense involving an intentional, knowing, reckless, *or criminally negligent* act or omission that constitutes maltreatment of a child or that impairs a child's physical or mental well-being." Admin. R. at 4 (emphasis added) (quoting *Matter of Velazquez-Herrera*, 24 I. & N. Dec. 503, 512 (BIA 2008)). Its interpretation, the Board said, doesn't require "actual harm or injury to a child" if the defendant's mental state was "greater than common law negligence" and there is "proof of a likelihood or reasonable probability that a child will be harmed." *Id.* (quotation marks omitted) (citing *Matter of Soram*, 25 I. & N. Dec. 378, 381 (BIA 2010), and *Matter of Rivera-Mendoza*, 28 I. & N. Dec. 184, 187–89 (BIA 2020)). The Board went on to hold that child neglect under Fla. Stat. § 827.03(2)(d) categorically falls within its interpretation of the INA because child neglect requires a mental state of "culpable negligence"—more than ordinary negligence—and encompasses conduct that "could reasonably be expected to result in" serious injury or death. *Id.* at 4–5 (citing, inter alia, *Jones v. State*, 292 So. 3d 519, 522 (Fla. Dist. Ct. App. 2020), and quoting Fla. Stat. § 827.03(1)(e) (defining "neglect of a child")).

Bastias filed a petition for review of the Board's decision in this Court, which we denied. *See Bastias v. U.S. Att'y Gen.*, 42 F.4th 1266, 1276 (11th Cir. 2022), *vacated and remanded*, 144. S. Ct. 2704

(2024) (mem.). Applying the deference principles enunciated in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), *overruled by Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), we concluded that the Board had reasonably interpreted § 1227(a)(2)(E)(i)'s phrase "crime of child abuse, child neglect, or child abandonment" to cover Bastias's child-neglect conviction under Fla. Stat. § 827.03(2)(d). *See Bastias*, 42 F.4th at 1272–76. In particular, we held that we were bound by our earlier decision in *Pierre v. U.S. Attorney General*, 879 F.3d 1241 (11th Cir. 2018), to conclude (1) that § 1227(a)(2)(E)(i) is ambiguous, *see Bastias*, 42 F.4th at 1272, and (2) that the Board had adopted a reasonable interpretation of the statute, *id*. at 1274–75.

Bastias then filed a petition for a writ of certiorari in the Supreme Court, which the Court held pending its decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). In *Loper Bright*, the Court overruled *Chevron*, holding that deference to an agency's interpretation of a statute contravenes the Administrative Procedure Act's directive that courts independently decide statutory and legal questions. *See id*. at 396–413. Following its decision, the Supreme Court granted Bastias's petition, vacated this Court's decision, and remanded "for further consideration in light of *Loper Bright*." *Bastias v. Garland*, 144 S. Ct. 2704, 2705 (2024) (mem.).

For the reasons explained in the opinions to follow, we **DENY** Bastias's petition for review.

21-11416          NEWSOM, J., Concurring                    1

NEWSOM, Circuit Judge, concurring in the judgment:

I concur in the Court's judgment denying Ariel Bastias's petition for review. There's no easy way to put this, but in capsule form, here's why: In *Pierre v. U.S. Attorney General*, 879 F.3d 1241 (11th Cir. 2018), applying the principles enunciated in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), *overruled by Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), we accepted the Board of Immigration Appeals' interpretation of the phrase "crime of child abuse," as used in 8 U.S.C. § 1227(a)(2)(E)(i), to include a state-law offense involving criminally negligent conduct that constitutes maltreatment but doesn't cause physical injury. Under the Board's broad reading, the state-law offense to which Bastias pleaded guilty—engaging in an act of culpably negligent child neglect that doesn't result in serious injury, *see* Fla. Stat. § 827.03(2)(d)—constitutes a deportable "crime of child abuse." The only truly difficult question, in my mind—and I do find it difficult—is whether *Pierre* remains good law, despite the facts (1) that it specifically grounded its interpretive analysis in *Chevron* and (2) that the Supreme Court expressly overruled *Chevron* in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). Counterintuitive though the conclusion may be, I believe that we remain bound by *Pierre*.

Let me explain.

## I

All here agree that in order to determine whether Bastias's state-law child-neglect conviction constitutes a "crime of child

abuse" within the meaning of 8 U.S.C. § 1227(a)(2)(E)(i)—and thus renders him deportable—we must apply the so-called "categorical approach." *See Esquivel-Quintana v. Sessions*, 581 U.S. 385, 389 (2017). The categorical approach requires, in essence, a side-by-side comparison of the applicable state and federal statutes: In particular, a reviewing court must assess the "relevant [state] statute of conviction, as construed by the state courts, and ask whether it 'categorically fits' within the generic definition of the federal offense." *Kemokai v. U.S. Att'y Gen.*, 83 F.4th 886, 892 (11th Cir. 2023) (quoting *Moncrieffe v. Holder*, 569 U.S. 184, 190 (2013)). A state conviction is a categorical match "only if the statute's elements are the same as, or narrower than, those of the generic offense." *Id.* (citation and quotation marks omitted). "Under the categorical approach, we consider only the fact of conviction and the statutory definition of the [state] offense, rather than the specific facts underlying the defendant's case." *Gelin v. U.S. Att'y Gen.*, 837 F.3d 1236, 1241 (11th Cir. 2016).

So, at the risk of grossly oversimplifying matters, a categorical-approach analysis entails two basic inputs: (1) the meaning of the governing federal statute, and (2) the meaning of the applicable state statute. I'll unpack each in turn. Fair warning: It's the former—discerning the meaning of § 1227(a)(2)(E)(i)—that, to my mind, presents the thorniest issue in this case.

## A

In pertinent part, the INA provides that "[a]ny alien who at any time after admission is convicted of . . . a crime of child abuse,

child neglect, or child abandonment is deportable." 8 U.S.C. § 1227(a)(2)(E)(i). As today's per curiam opinion recounts, the Board of Immigration Appeals has interpreted § 1227(a)(2)(E)(i) broadly. *See* Maj. Op. at 3. In particular, and as relevant here, the Board has held that the statutory term "crime of child abuse" (1) encompasses "any offense involving a[] . . . criminally negligent act or omission that constitutes maltreatment of a child or that impairs a child's physical or mental well-being," *Matter of Velazquez-Herrera*, 24 I. & N. Dec. 503, 512 (BIA 2008), and (2) is not limited to state-law crimes "requiring proof of actual harm or injury to the child," *Matter of Soram*, 25 I. & N. Dec. 378, 381 (BIA 2010). Both in our initial opinion in this case and in the decision on which we principally relied, *Pierre v. U.S. Attorney General*, 879 F.3d 1241 (11th Cir. 2018), we held that § 1227(a)(2)(E)(i) was ambiguous and therefore deferred to the Board's interpretation under the principles set forth in *Chevron*. *See Bastias v. U.S. Att'y Gen.*, 42 F.4th 1266, 1274–75 (11th Cir. 2022), *vacated and remanded*, 144 S. Ct. 2704 (2024) (mem.).

But then came *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), in which the Supreme Court expressly overruled *Chevron*. Unsurprisingly, given *Loper Bright*'s directive that courts must "exercise their independent judgment" in construing the statutes before them and, further, that they "may not defer to an agency interpretation of the law simply because a statute is ambiguous," *id*. at 412–13, the parties here vigorously debate § 1227(a)(2)(E)(i)'s proper interpretation as a matter of first principles, without regard to the Board's preexisting interpretation.

21-11416          NEWSOM, J., Concurring                    4

So, for instance, Bastias contends that § 1227(a)(2)(E)(i) is best read not to include most negligent, non-injurious conduct. *See* Br. of Appellant at 30. The government, by contrast, insists that the federal generic definition is properly understood to cover state-law crimes that involve negligent conduct that risks harm to a child. *See* Br. of Appellee at 25. Judges Marcus and Middlebrooks have likewise weighed in with their own (slightly different) readings. *See* Marcus Concurring Op. at 26–33; Middlebrooks Concurring Op. at 4–13. All make good points and raise interesting arguments.

Before considering the various competing readings of § 1227(a)(2)(E)(i), however, there's an antecedent question that we have to address: While it's no doubt true under *Loper Bright* that we "need not"—and indeed "may not"—defer to the Board's interpretation *as such*, 603 U.S. at 413, might we nonetheless be bound, despite *Loper Bright*, by our earlier decision in *Pierre*, which adopted the Board's interpretation? It's complicated, but I've concluded—more than a little reluctantly—that we are.

I'll first detail what *Pierre* said, and then explain why I think we're bound by it.

**1**

In *Pierre*, we addressed a situation very much like the one in this case. There, as here, the government sought to remove a lawful permanent resident on the ground that he had committed "a crime of child abuse" within the meaning of § 1227(a)(2)(E)(i). The alien in *Pierre* had pleaded guilty to battery of a child, in violation of a different state statute—namely, Fla. Stat.

§ 784.085(1), which, in pertinent part, makes it a crime to "knowingly cause or attempt to cause a child to come into contact with" any of several bodily fluids. *See Pierre*, 879 F.3d at 1245–46.

In performing the required categorical-approach analysis—which, as already explained, requires a comparison of the applicable federal and state statutes—the *Pierre* court first turned its attention to the meaning of the term "crime of child abuse" as used in § 1227(a)(2)(E)(i). Employing the then-extant *Chevron* framework, the panel noted that "[t]he INA does not define 'child abuse'" and therefore treated the statute as "silent on the issue." *Id*. at 1249. Accordingly, the panel continued, "we may defer to the BIA's interpretation of the INA, so long as that interpretation is reasonable and consistent with the statute." *Id*. (citing *Chevron*, 467 U.S. at 843).

The *Pierre* court then proceeded to unpack the Board's interpretation of § 1227(a)(2)(E)(i). In so doing, the panel pointed to the same two decisions that principally underlay the Board's decision in this case: *Velazquez-Herrera*, 24 I. & N. Dec. 503, and *Soram*, 25 I. & N. Dec. 378. In particular, the *Pierre* panel observed that under *Velazquez-Herrera*, the term "crime of child abuse" encompasses "any offense involving an intentional, knowing, reckless, or criminally negligent act or omission that constitutes maltreatment of a child or that impairs a child's physical or mental well-being." *Pierre*, 879 F.3d at 1249 (quoting *Velazquez-Herrera*, 24 I. & N. Dec. at 517). And per *Soram*, the panel continued, "child abuse crimes under the INA are not limited to those offenses

'requiring proof of actual harm or injury to the child'" but, rather, also include "endangerment-type crimes" as well as any "act or omission that constitutes maltreatment of a child." *Id*. at 1250 (quoting *Soram*, 25 I. & N. Dec. at 381, 383).

Having settled on the prevailing interpretation of § 1227(a)(2)(E)(i), the *Pierre* panel shifted its focus to state law and, in particular, to the question whether the child-battery statute under which the alien there had been convicted was a categorical match: "With this background in mind, we now examine whether the Florida statute fits within the [Board's] generic and broad definition of 'child abuse.'" *Id*. The panel held that it did: The state statute, the panel observed, "requires an overt act" for conviction of either a completed battery or an attempt, and "[a]t a minimum, th[e] repugnant type of battery or attempted battery" entailed in knowingly directing bodily fluids at a child "constitutes maltreatment of a child." *Id*. (citing *Soram*, 25 I. & N. Dec. at 382–83).

Putting the pieces together, the *Pierre* panel announced its judgment (as relevant here) as follows: "[A]pplying *Chevron* deference to the definitions of 'child abuse' found in *Velazquez-Herrera* and *Soram*, we (1) uphold them as reasonable interpretations of the INA, to the extent they apply to Pierre's case, and (2) conclude that the [Board] did not err in concluding that Pierre's conviction for battery on a child constituted a crime of child abuse." *Id*. at 1251. Importantly—because it gives rise to an argument for cabining *Pierre*'s reach that I'll explore shortly—the

panel appended a footnote to its decision: "Because Pierre's conviction necessarily involved a knowing and overt act, Pierre's case does not require us to determine whether purely negligent acts with no injury to the child proscribed by a state statute constitute generic crimes of child abuse." *Id*. at 1251 n.3.

So, it's pretty (although not perfectly) clear what we said in *Pierre* about the scope and meaning of the phrase "crime of child abuse" as used in § 1227(a)(2)(E)(i): Deferring under *Chevron*, we accepted the Board's interpretation—namely, that it includes a state-law offense that involves a criminally negligent conduct that constitutes maltreatment but that doesn't cause any actual injury. The much thornier question—to which I'll turn next—is whether, despite *Loper Bright*'s overruling of *Chevron*, we remain bound by that aspect of *Pierre*. I believe we are.

**2**

I begin with our "prior panel precedent" rule. In this Circuit, "a prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting *en banc*." *In re Lambrix,* 776 F.3d 789, 794 (11th Cir. 2015) (citation omitted). We haven't overruled or abrogated *Pierre* en banc. (Yet—more on that in a bit.) The more pertinent question is whether the Supreme Court's decision in *Loper Bright* did so. It's a close call, but I don't think it did.

The bar for concluding that the Supreme Court has abrogated one of our decisions is high: "[T]he later Supreme Court

decision must 'demolish[]' and 'eviscerate[]' each of its 'fundamental props.'" *Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1223 (11th Cir. 2022) (second and third alterations in original). *Loper Bright* doesn't clear that hurdle. To be sure, *Pierre*'s interpretation of § 1227(a)(2)(E)(i) was grounded in *Chevron*. *See Pierre*, 879 F.3d at 1251 (applying "*Chevron* deference to the definitions of 'child abuse' found in *Velazquez-Herrera* and *Soram*"). And to be sure, the Supreme Court in *Loper Bright* overruled *Chevron* and instituted a new interpretive framework, requiring courts to "exercise their independent judgment in deciding whether an agency has acted within its statutory authority." 603 U.S. at 412.

Conspicuously, though, the Court didn't stop there. It went on to cabin the scope of its ruling in a passage that, given its importance here, bears quoting in full:

> [W]e do not call into question prior cases that relied on the *Chevron* framework. The holdings of those cases that specific agency actions are lawful— including the Clean Air Act holding of *Chevron* itself— are still subject to statutory *stare decisis* despite our change in interpretive methodology. *See CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008). Mere reliance on *Chevron* cannot constitute a "'special justification'" for overruling such a holding, because to say a precedent relied on *Chevron* is, at best, "just an argument that the precedent was wrongly decided." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 266 (2014) (quoting *Dickerson v. United States*,

> 530 U.S. 428, 443 (2000)).  That is not enough to justify overruling a statutory precedent.

*Id.*

Here's what I take to be clear:  The Supreme Court overruled *Chevron*, but it did so only on a prospective basis; the Court expressly "d[id] not call into question prior cases that relied on the *Chevron* framework." *Id.*  The "holdings" of those cases— more, shortly, on exactly what those may be—remain good law and are entitled to *stare decisis* effect. *Id.*  While the Court held open the possibility that some "special justification" might warrant departing from a *Chevron*-era case's holding, "[m]ere reliance on *Chevron*" doesn't constitute such a justification. *Id.*  Beyond that, so much uncertainty.

Unsurprisingly, *Loper Bright* has vexed the lower courts.  Our sister circuits have expressed divergent views about what sorts of "holdings" the Supreme Court meant to preserve—and in particular, whether *stare decisis* treatment extends to a court's *Chevron*-era adoption of an agency's statutory interpretation or, instead only, and more narrowly, to the court's case-specific application of that interpretation to the facts before it. *Compare, e.g.*, *Tennessee v. Becerra*, 131 F.4th 350, 366 (6th Cir. 2025) (observing, relatively broadly, that "a 'specific agency action' attaches to an agency's particular construction of a statute"), *with, e.g.*, *In re MCP No. 185*, 124 F.4th 993, 1002 (6th Cir. 2025) (observing, relatively narrowly, that "[t]he 'specific agency action' that the [Supreme] Court approved in [*National Cable &*

*Telecommunications Association v. Brand X Internet Services*, 545 U.S. 967 (2005)] was the FCC's 2002 [] Ruling" whereas "[t]he specific action before us here is the FCC's 2024 Safeguarding Order . . . [which] means we are not bound by *Brand X*'s holding as a matter of statutory *stare decisis*"); *see also Lopez v. Garland*, 116 F.4th 1032, 1045 (9th Cir. 2024) (finding itself bound by a *Chevron*-era panel's acceptance of the BIA's "reasonable interpretation" of the Immigration and Nationality Act).

A similar question confronts us here.  What is the "holding[]" of *Pierre*?  Bastias contends—and my colleague Judge Marcus agrees—that *Pierre*'s holding is narrowly limited to the circumstances of that case—in particular, to the court's determination there that a different Florida criminal statute, Fla. Stat. § 784.085, was a categorical match for the INA's "crime of child abuse" provision.  *See* Br. of Appellant at 22–23; Marcus Concurring Op. at 13–15.  It's not a trivial argument.  As already noted, having settled on a (*Chevron*-based) reading of § 1227(a)(2)(E)(i), and then compared that interpretation to the state law at issue, the *Pierre* court summed up its conclusion—as relevant here—in these terms:  "[A]pplying *Chevron* deference to the definitions of 'child abuse' found in *Velazquez–Herrera* and *Soram*, we . . . uphold them as reasonable interpretations of the INA, *to the extent they apply to Pierre's case*."  *Pierre*, 879 F.3d at 1251 (emphasis added).  And as already noted, to that statement the panel appended the following footnote:  "Because Pierre's conviction necessarily involved a knowing and overt act, Pierre's case does not require us to determine whether purely negligent

21-11416              NEWSOM, J., Concurring              11

acts with no injury to the child proscribed by a state statute constitute generic crimes of child abuse." *Id*. at 1251 n.3. Thus, Bastias contends, *Pierre* blessed the Board's broad reading of the phrase "crime of child abuse" *only* "to the extent [it] appl[ied]" to the case before it—which is to say, only vis-à-vis a state-court conviction that involved a "knowing and overt act," and not one, as in this case, that involved only "purely negligent acts with no injury to the child." *Id*.; *see* Br. of Appellant at 21–23.

As I said, Bastias's position isn't trivial—but I think it's misguided for three (related) reasons. I'll address them in turn.

a

As an initial matter, I think Bastias's position misunderstands *Loper Bright*. To repeat, the Supreme Court said there that despite its repudiation of the *Chevron* framework, "[t]he holdings of [*Chevron*-era] cases that specific agency actions are lawful—including the Clean Air Act holding of *Chevron* itself—are still subject to statutory *stare decisis*." *Loper Bright*, 603 U.S. at 412.

Hardly perfectly pellucid, but in that passage I find two clues that when the Supreme Court said it meant to preserve the "holdings" of *Chevron*-era cases, it was referring not, as Bastias seems to suggest, only to a court's case-specific application of a judicially approved agency interpretation to a particular set of facts, but rather, and more broadly, to that court's antecedent determination that the agency's reading of the governing statute was "lawful."

The first clue is the Court's invocation of "statutory *stare decisis*." That, it seems to me, is a pretty strong signal that we should be focused on the legal rule that a *Chevron*-era precedent establishes rather than just its fact- and party-bound result. To be sure, there are doctrines like res judicata that train narrowly on particular litigants, claims, and judgments. *See, e.g.*, Bryan A. Garner et al., *The Law of Judicial Precedent* 374 (2016). But *stare decisis* is different—bigger, in a sense. Whereas res judicata "involves a judgment that results from a particular application of a legal principle to particular facts," *stare decisis* "dictates"—more broadly—"which legal principle should apply." *Id.*; *see also Payne v. Tennessee*, 501 U.S. 808, 827 (1991) ("*Stare decisis* . . . promotes the evenhanded, predictable, and consistent development of *legal principles* . . .") (citing *Vasquez v. Hillery*, 474 U.S. 254, 265–66 (1986)) (emphasis added). And indeed, with respect to statutory *stare decisis*—of the sort specifically addressed by *Loper Bright*—the focus on the court's interpretation is even clearer, because "[t]he traditional Anglo-American view is that an authoritative interpretation of the written law (legislation) acquires the power of law and becomes part of the statute itself." *Id.* at 333. All of which is to say that I take the Supreme Court's reference to "statutory *stare decisis*" to indicate an intent to preserve *Chevron*-era courts' interpretations, not just their results.

The second clue: The *Loper Bright* Court provided an example of the sort of holding it meant to accord *stare decisis* effect—namely, "the Clean Air Act holding of *Chevron* itself." And what was that holding? Per the *Chevron* Court's own words, it at

21-11416              NEWSOM, J., Concurring              13

the very least included the approval of the EPA's interpretation of the Act, as well as its ensuing application of that reading to the particular facts of the case: "We *hold* that the EPA's definition of the term 'source' is a permissible construction of the statute." *Chevron*, 467 U.S. at 866 (emphasis added). By parity of reasoning, the "holding" of *Pierre*, in *Loper Bright* terms, at the very least included the panel's approval of the Board's broad reading of § 1227(a)(2)(E)(i), as well as its ensuing categorical-approach application of that interpretation to the particular Florida child-battery statute there at issue.[1]

**b**

Second, and more generally, Bastias's position misunderstands the nature of the *Chevron* determination. Under the *Chevron* framework, which applied at the time *Pierre* was decided, the reasonableness of an administrative agency's interpretation of a statute is an all-or-nothing thing: The agency's interpretation is either reasonable or it isn't. In construing a statutory phrase—here, "crime of child abuse" in § 1227(a)(2)(E)(i)—the agency in effect says, "Here's what that phrase means." The reviewing court can then either bless or reject the agency's reading—thumbs up or thumbs down. But it makes

---

[1] On balance, this reading of *Loper Bright* is reinforced by the Court's citation, *see* 603 U.S. at 412, of *CBOCS West, Inc. v. Humphries*, which had emphasized that "considerations of *stare decisis* . . . impose a considerable burden upon those who would seek a different *interpretation* that would necessarily unsettle many Court precedents." 553 U.S. at 451–52 (emphasis added).

21-11416          NEWSOM, J., Concurring          14

no sense to say that an agency's interpretation of a statute is reasonable with respect to some concrete applications—say, the one at issue in *Pierre*—but potentially unreasonable with respect to others—say, the one at issue in this case.    If an agency's interpretation entails potentially odd results—here, for example, that it might reach purely negligent conduct that doesn't actually injure a child—that might provide the court a basis to reject it as unreasonable.    But I don't think it's coherent for a court applying *Chevron* to say that the agency's interpretation of a statutory term is reasonable . . . *sometimes*.    *Cf. Barnhart v. Thomas*, 540 U.S. 20, 29 (2003) ("The proper *Chevron* inquiry is not whether the agency construction can give rise to undesirable results in some instances . . . , but rather whether, in light of the alternatives, the agency construction is reasonable.").    Accordingly, it seems to me, the only logical and coherent way to understand our (admittedly confusing) *Pierre* opinion is that the panel there (1) accepted as reasonable the Board's broad interpretation of the phrase "crime of child abuse" in § 1227(a)(2)(E)(i) and then (2) applied that interpretation to the state child-battery statute before it, leaving open for a future case (like this one) the question how—and this is the key point—*that same interpretation* would apply to a different state statute that criminalized purely negligent misconduct.

**c**

Finally, and more generally still, Bastias's argument misunderstands the nature of holdings.    Whatever else it said and did, *Loper Bright* expressly preserved *Chevron*-era "holdings."    603 U.S. at 412.    And what, under our precedent about precedent, is a

21-11416                    NEWSOM, J., Concurring                    15

holding? It's not, as Bastias suggests, just the bottom-line result. While it's true that we've said that "the holding[] of a prior decision can reach only as far as the facts and circumstances presented to the Court in the case which produced that decision," *United States v. Aguillard*, 217 F.3d 1319, 1321 (11th Cir. 2000) (quoting *United States v. Hunter*, 172 F.3d 1307, 1309 (11th Cir. 1999) (Carnes, J., concurring)), we've also emphasized—ad nauseam—that "[t]he holding of a case comprises *both* the result of the case *and* those portions of the opinion necessary to that result." *United States v. Gillis*, 938 F.3d 1181, 1198 (11th Cir. 2019) (emphases added) (quoting *United States v. Caraballo-Martinez*, 866 F.3d 1233, 1244 (11th Cir. 2017)); *accord United States v. Kaley*, 579 F.3d 1246, 1253 n.10 (11th Cir. 2009). It is sufficient to "holding" status, therefore, that a statement in a court's opinion was "necessary to th[e] result."[2]

So what about *Pierre*, what was its "holding[]"—and, in particular, was its adoption of the Board's interpretation of § 1227(a)(2)(E)(i) a holding? I think it pretty clearly was. As already explained, *see supra* at 4–7, the *Pierre* panel laid out the logic of its decision in three steps. First, deferring under *Chevron*, it accepted

---

[2] To be clear, "strict necessary-ness is not *essential* to a statement's holdingness." *United States v. Files*, 63 F.4th 920, 930 (11th Cir. 2023) (emphasis added). To the contrary, we have treated some statements that aren't strictly necessary to a decision's outcome—alternative holdings, non-supportive holdings, etc.—as nonetheless entitled to holding status. *See id.* at 927–30. But by all accounts, necessary-ness is a *sufficient* basis for treating a court's statement as part of its holding.

as reasonable—and thus as binding—the Board's broad reading of the phrase "crime of child abuse" as encompassing a state-law offense that involves criminally negligent conduct that constitutes maltreatment but that doesn't cause any actual injury. *See Pierre*, 879 F.3d at 1249–50 (citing *Velazquez-Herrera*, 24 I. & N. Dec. at 517; and *Soram*, 25 I. & N. Dec. at 378, 381, 383). Second, having established that federal-law baseline, the panel delineated the state-law elements of the Florida child-battery statute at issue. *See id.* at 1250. And finally, having discerned the requirements of both federal and state law, the panel proceeded to conduct a categorical-approach analysis and concluded that the state law was a match for—and therefore that it qualified as—a "crime of child abuse" for removal purposes. *See id.* at 1251. In the terminology that we have consistently used to characterize a statement in an opinion as part of a decision's holding, the *Pierre* panel's adoption of the Board's reading of § 1227(a)(2)(E)(i) was "necessary to th[e] result" it reached. *Gillis*, 938 F.3d at 1198. In particular, it supplied the major premise of the panel's logic; without a federal baseline against which to measure the Florida battery statute at issue there, the panel couldn't have conducted the comparison that underlay its categorical-approach analysis.[3]

---

[3] Separately—and perhaps more broadly—we have suggested a court's "statement[] of a legal rule" constitutes a holding, even if "technically unnecessary to a case's resolution." *Files*, 63 F.4th at 928. So even if the *Pierre* panel's adoption of the BIA's interpretation wasn't strictly, logically necessary to its decision—in the deductive sense that I've outlined above the line—it

★  ★  ★

To sum up: *Loper Bright* didn't "overrule[]" or "abrogat[e]" *Pierre* in any way that would justify us walking away from it. *See Lambrix*, 776 F.3d at 794. To the contrary, the Supreme Court there expressly *preserved* the "holdings" of *Chevron*-era decisions like *Pierre*. *Loper Bright*, 603 U.S. at 412. And for the reasons I've tried to explain, the *Pierre* panel's adoption of the Board's broad reading of § 1227(a)(2)(E)(i) was indeed part of its "holding[]." Accordingly, under our prior-panel-precedent rule, we are bound by *Pierre*'s interpretation of the phrase "crime of child abuse" to include offenses that involve criminally negligent conduct that constitutes maltreatment but does not cause physical injury.

**B**

The lone remaining question—which, happily, is much simpler—is whether the state-law offense to which Bastias pleaded guilty is a categorical match for, and thus qualifies as, a "crime of child abuse" under the binding, *Pierre*-approved interpretation of that phrase as used in § 1227(a)(2)(E)(i). It is, and it does.

To repeat, the pertinent Florida statute extends to any "person who willfully or by culpable negligence neglects a child without causing great bodily harm, permanent disability, or permanent disfigurement to the child." Fla. Stat. § 827.03(2)(d).

---

seems to me that it would qualify for holding status as the "statement[] of a legal rule."

21-11416                 NEWSOM, J., Concurring                 18

Here, there is a categorical match, both with respect to the mens rea and with respect to the actus reus.

As for the mental state, Fla. Stat. § 827.03(2)(d) requires "culpable negligence," which Bastias concedes is at the very least "akin to criminal negligence." Br. of Appellant at 51. It thus follows that the mens rea prescribed by the applicable Florida statute is encompassed within § 1227(a)(2)(E)(i)'s requirement of an "intentional, knowing, reckless, or *criminally negligent*" mental state. *Pierre*, 879 F.3d at 1249 (quoting *Velazquez-Herrera*, 24 I&N Dec. at 517) (emphasis added).

As for the actus reus, the Florida statute criminalizes "neglect[]," which it defines as a caregiver's failure to provide "care, supervision, and services necessary to maintain the child's physical and mental health," or the "failure to make a reasonable effort to protect a child from abuse, neglect, or exploitation by another person." Fla. Stat. § 827.03(1)(e). The state law further clarifies that "neglect of a child may be based on repeated conduct or on a single incident or omission that results in, or could reasonably be expected to result in, serious physical or mental injury, or a substantial risk of death, to a child." *Id.* That explanation of "neglect[]" fits comfortably within the scope of § 1227(a)(2)(E)(i), which, as interpreted in *Pierre*, "is sufficiently broad to encompass endangerment-type crimes." *Pierre*, 879 F.3d at 1250 (quoting *Soram*, 25 I. & N. Dec. at 379, 383). And to be clear, it's no answer to say, as Bastias does, that the Florida statute isn't a categorical match because it doesn't require harm. *Pierre* squarely forecloses

that argument, as it explained that "child abuse crimes under the INA are not limited to those offenses 'requiring proof of actual harm or injury to the child.'" *Id.* (quoting *Soram*, 25 I. & N. Dec. at 381).

## C

Before I close, let me say a few words in response to Judge Marcus's characteristically thoughtful separate opinion, which concludes (1) that we are not bound by *Pierre* but (2) that Bastias's petition is nonetheless due to be denied on a de novo reading of § 1227(a)(2)(E)(i).

First, with respect to *Pierre*, Judge Marcus contends that the panel's "adoption of the BIA's definition of the [phrase] 'crime of child abuse' was not complete or all-encompassing." Marcus Concurring Op. at 16. Rather, he says, the panel accepted only the "part[]" of the BIA's interpretation that covers knowing violations and actual injuries and rejected the "part[]" that went further. *Id.* at 16–17. And as I've acknowledged, Judge Marcus's reading of *Pierre* isn't without some foundation. After all, the panel there (1) purported to "uphold" the BIA's interpretations of § 1227(a)(2)(E)(i) in *Velazquez-Herrera* and *Soram* "to the extent they appl[ied] to Pierre's case" and (2) said that "[b]ecause Pierre's conviction necessarily involved a knowing and overt act, [his] case d[id] not require [the panel] to determine whether purely negligent acts with no injury to the child proscribed by a state statute constitute generic crimes of child abuse." 879 F.3d at 1251 & n.3.

21-11416                 NEWSOM, J., Concurring                 20

In the usual case, a court may well be entitled to trim its sails in that manner—*i.e.*, to cabin the scope of its holding simply by speaking a limitation into existence.[4]  For reasons I've tried to explain, though, the particular determinations that *Chevron* required courts to make take us out of usual-case territory.  For good or ill, the *Chevron* framework presented a reviewing court with a pair of yes-no questions.  Is the statute ambiguous, and if so, is the agency's interpretation reasonable?  The answer to that all-important second question was, as I've described it, an "all-or-nothing thing:  The agency's interpretation is either reasonable or it isn't."  *Supra* at 13.  *Chevron* simply didn't leave courts a "concurring in part" option.  So despite the *Pierre* panel's seeming (?) desire to narrow its adoption of the BIA's reading of § 1227(a)(2)(E)(i) to the particular set of facts before it, I don't think it was capable of doing so.

Second, Judge Marcus concludes—*Pierre* aside, and considering the issue de novo—that Bastias's petition should be denied on the ground that his state crime is a categorical match for the generic federal offense specified in 8 U.S.C. § 1227(a)(2)(E)(i). *See* Marcus Concurring Op. at 19 *et seq*.  As a reminder, that provision, in relevant part, renders deportable any alien who is convicted of "a crime of child abuse, child neglect, or child

---

[4] Even in the usual case, a court's authority simply to decree the breadth of its holding isn't entirely free from doubt. *See, e.g.*, Garner et al., *supra*, at 59 (observing that "while the court's statement of the holding is important, it doesn't necessarily decide the matter," including when it gives "too narrow a statement of the issue and answer").

abandonment." In his categorical-approach analysis, Judge Marcus focuses on what he calls "the federal 'crime of . . . child neglect' standing alone, rather than making the comparison to the enumerated bundle of crimes against children found in the INA ('child abuse, child neglect, or child abandonment')." *Id.* at 26. Narrowing the focus to "child neglect," he maintains, is "easier and more direct" and "avoids the unnecessary task of divining the meaning of the broader generic 'crime of child abuse.'" *Id.* at 26–27.

I'm not so sure. As an initial matter, it's not obvious to me that § 1227(a)(2)(E)(i) can be carved up the way that Judge Marcus asserts—that is, among what he takes to be the three separate offenses of "child abuse," "child neglect," and "child abandonment." The parties here, at least, seem to disagree with Judge Marcus's discrete-offenses interpretation; they read § 1227(a)(2)(E)(i) to criminalize a "single category" of crimes that "encompasses the entire phrase." Supp. Br. of Appellee 8; *accord* Supp. Br. of Appellant 6 n.3. Judge Middlebrooks likewise reads the phrase "a crime of child abuse, child neglect, or child abandonment" to "represent[] a single category of crimes," not to comprise three distinct offenses. Middlebrooks Concurring Op. at 4–5 (quoting *Cruz v. Garland*, 101 F.4th 361, 365 (4th Cir. 2024)). Perhaps Judge Marcus will ultimately be proven correct, but his interpretation—which takes several pages to unpack and, as he acknowledges, has to overcome § 1227(a)(2)(E)'s title as well as existing sister-circuit precedent—doesn't strike me as a particularly "eas[y]." Marcus Concurring Op. at 26–30 & n.2.

21-11416                    Newsom, J., Concurring                    22

Moreover, and in any event, even if Judge Marcus is right that "child neglect" can be broken out as a standalone federal comparator, it's not clear to me that the comparison nets the result that Judge Marcus thinks it does. On the state side of the equation, Judge Marcus concludes—after an exhaustive survey of legislative history and Florida caselaw—that the term "culpable negligence," as used in Fla. Stat. § 827.03(2)(d), requires a showing of something like "recklessness." *See* Marcus Concurring Op. at 26. (After a similarly exhaustive analysis, Judge Middlebrooks seems to land in a similar, although not quite identical, place. *See* Middlebrooks Concurring Op. at 8–13.) The problem, as I see it, is on the federal side. Not all that long ago, in an effort to determine the mens rea required in § 1227(a)(2)(E)(i) cases in which no actual injury occurs, a Tenth Circuit panel conducted an exhaustive 50-state survey of contemporaneous state criminal laws. Its most significant finding was that "twenty-seven states"—an absolute majority—"required a *mens rea* of knowing or intentional." *Ibarra v. Holder*, 736 F.3d 903, 915 (10th Cir. 2013). The unmistakable upshot of that analysis, it seems to me—at least on a de novo review of the sort that Judge Marcus thinks is required—is that federal law likely requires proof of a mental state *higher* than recklessness. Accordingly, the comparison on which Judge Marcus insists yields a result—namely, that there is no categorical match and that Bastias's petition should thus be granted—with which Judge Marcus disagrees.[5]

---

[5] Judge Marcus doesn't mention the results of the *Ibarra* panel's survey, and he disclaims any need to "dive too deeply into" the mens rea issue because, he says, Bastias "acknowledges that a *mens rea* of recklessness is sufficient to

21-11416                 Newsom, J., Concurring                 23

## II

Here, then, is my conclusion:  Taking the Board's *Pierre*-approved interpretation of § 1227(a)(2)(E)(i) as the federal baseline—as I think we must, under both *Loper Bright* and our own prior-panel-precedent rule—the crime to which Bastias pleaded guilty under Fla. Stat. § 827.03(2)(d) is a categorial match for the INA's generic federal "crime of child abuse."  Accordingly, Bastias's state-law conviction is a valid ground for his removal, and his petition for review should be denied.

But.

I favor rehearing this case en banc, for two reasons.  First, the Board's definition of "crime of child abuse," which we approved in *Pierre*, is exceedingly broad—it arguably sweeps in all manner of conduct that might not square with the ordinary

---

sustain a conviction on the federal side of the equation."  Marcus Concurring Op. at 36 (citing Reply Br. of Appellant at 9).  With respect, I think Judge Marcus may be overreading what he calls Bastias's "acknowledge[ment]." .Bastias simply contends that "negligent, non-injurious conduct falls within neither" the term "child abuse" nor the term "child neglect."  Reply Br. of Appellant at 9.  Bastias isn't so much conceding recklessness as much as he's ruling out negligence.  Moreover, and in any event, we have long held that "[a] court is not bound by the parties' stipulations of law, particularly when those stipulations are erroneous."  *United States v. Lightsey*, 120 F.4th 851, 859 (11th Cir. 2024) (quoting *King v. United States*, 641 F.2d 253, 258 (5th Cir. 1981)).  So no matter how aggressively one reads Bastias's reply brief, the legal fact remains:  Section 1227(a)(2)(E)(i) crimes that don't result in an injury may well require a mens rea north of recklessness—which, on a de novo categorical-approach comparison, would flip this case's outcome.

21-11416                NEWSOM, J., Concurring                24

understanding of that phrase.  At the very least, I think that Bastias has presented substantial arguments that the Board's reading of § 1227(a)(2)(E)(i) isn't the best one.  Which leads me to the second, and more fundamental, reason that I favor en banc rehearing:  It would permit the full Court to carefully consider and decide (1) how *Loper Bright*'s recognition of "statutory *stare decisis*" principles interacts—if at all—with our own prior-panel-precedent rule, (2) how we ought to deal with *Chevron*-era precedents on a going-forward basis, and (3) whether (depending on the answers to those questions) we should continue to consider ourselves bound by *Pierre*.

21-11416                    MARCUS, J., Concurring                    1

MARCUS, Circuit Judge, concurring in the judgment:

Today we hold that Bastias's Petition for Review should be denied, although we reach this conclusion for different reasons. As I see it, the essential questions in this case are: (1) whether this Court's decision in *Pierre v. U.S. Attorney General*, 879 F.3d 1241 (11th Cir. 2018), which found a categorical match between the Florida state crime of battery of a child involving bodily fluids and the generic "crime of child abuse" found in the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1227, provides the rule of decision in this case; and (2) whether there is a "match" under the categorical approach between Bastias's state crime of conviction for child neglect in violation of the Florida penal code and the federal "crime of . . . child neglect" found in the INA. My colleague Judge Newsom concludes that Bastias is removable because we are bound by our decision in *Pierre*. I write separately to explain why I think we are not bound by *Pierre*, which decided a different question and made a different match between a different state crime and the crimes enumerated in the INA, and to offer a different basis for why I've concluded that the state crime of child neglect "matches" with the federal "crime of . . . child neglect" found in the INA. *Id.*

**I.**

Ariel Marcelo Bastias is a native and citizen of Chile. On February 6, 1997, Bastias adjusted status to that of a Lawful Permanent Resident. On October 4, 2019, Bastias pleaded guilty to an offense under Florida Statute § 827.03(2), which reads this way:

21-11416                    MARCUS, J., Concurring                    2

827.03 Abuse, aggravated abuse, and neglect of a child; penalties.--

. . .

(2) OFFENSES.--

(a) A person who commits aggravated child abuse commits a felony of the first degree . . . .

(b) A person who willfully or by culpable negligence neglects a child and in so doing causes great bodily harm, permanent disability, or permanent disfigurement to the child commits a felony of the second degree . . . .

(c) A person who knowingly or willfully abuses a child without causing great bodily harm, permanent disability, or permanent disfigurement to the child commits a felony of the third degree . . . .

(d) A person who willfully or by culpable negligence neglects a child without causing great bodily harm, permanent disability, or permanent disfigurement to the child commits a felony of the third degree . . . .

Fla. Stat. § 827.03(2).

As we explained in our first panel opinion, it is unclear which of these enumerated crimes Bastias pleaded guilty to. *See Bastias v. U.S. Att'y Gen.* ("*Bastias I*"), 42 F.4th 1266, 1269 (11th Cir. 2022), *vacated sub nom.*, *Bastias v. Garland*, 144 S. Ct. 2704 (2024). The state judgment of conviction lists "AGGRAVATED CHILD ABUSE"

21-11416                    MARCUS, J., Concurring                    3

under "827.03(2)," but it lists the "Level/Degree" as "Felony/SECOND DEGREE." Meanwhile, the state court sentencing scoresheet describes Bastias's offense as "Child Neglect" and lists the "FELONY DEGREE" as 3. Further adding to the confusion is Bastias's plea colloquy. The state court judge said to Bastias: "I will adjudicate you guilty of [the] charge of aggravated child -- nope, of child neglect -- child abuse, child neglect, a felony of the third degree so it's a lesser included offense of what you were originally charged with." And later, when the clerk asked for the statute number under which Bastias was convicted, the judge said, "Oh, I don't know" and then replied, "Whatever" after one of the attorneys suggested "827" for the statute number.

On August 4, 2020, Bastias was served with a Notice to Appear before an immigration judge, which charged that he was subject to removal from the United States pursuant to Section 237(a)(2)(E)(i) of the INA, 8 U.S.C. § 1227(a)(2)(E)(i), because he was "an alien who at any time after entry has been convicted of a crime of domestic violence, a crime of stalking, or a crime of child abuse, child neglect, or child abandonment."

After losing his petition before the immigration judge, Bastias appealed to the Board of Immigration Appeals ("BIA"), arguing that child neglect under Section 827.03(2)(d) contains elements falling outside of the generic definition of child abuse, thus barring a match between the least culpable conduct necessary to sustain the state conviction and the "crime of child abuse, child neglect, or child abandonment" under 8 U.S.C. § 1227(a)(2)(E)(i).

21-11416                    MARCUS, J., Concurring                    4

On April 2, 2021, the BIA dismissed Bastias's appeal, having determined that the conduct needed to sustain a conviction under Section 827.03(2)(d) qualifies as a "crime of child abuse" as the BIA had previously interpreted the phrase.

Bastias appealed the BIA's ruling to our Court. After oral argument, we denied Bastias's petition for review. *Bastias I*, 42 F.4th at 1268. We approached the BIA's determination deferentially, invoking the rules enunciated by the Supreme Court in *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), and we concluded that the BIA had reasonably interpreted the "crime of child abuse, child neglect, or child abandonment," 8 U.S.C. § 1227(a)(2)(E)(i), to include Bastias's child neglect conviction under Florida Statute § 827.03. We said we were bound by this Court's earlier decision in *Pierre*, where a panel of this Court determined, among other things, that the meaning of "crime of child abuse" is ambiguous under "step one" of *Chevron*. *Bastias I*, 42 F.4th at 1272; *Pierre*, 879 F.3d at 1249. Because the term is undefined and ambiguous, we proceeded to "step two" of *Chevron* and determined that the agency's definition was "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843; *Bastias I*, 42 F.4th at 1274. Accordingly, we affirmed the BIA's dismissal of Bastias's appeal. *Bastias I*, 42 F.4th at 1276.

On June 28, 2024, the Supreme Court overruled *Chevron* in *Loper Bright Enterprises v. Raimondo*, 142 S. Ct. 2244 (2024). *Loper Bright* rejected the *Chevron* framework and the requirement that courts defer to agency interpretations. The Court observed that

21-11416              Marcus, J., Concurring                5

the Administrative Procedure Act ("APA") "incorporates the traditional understanding of the judicial function, under which courts must exercise independent judgment in determining the meaning of statutory provisions," *id.* at 2262, and "in deciding whether an agency has acted within its statutory authority, as the APA requires," *id.* at 2273. Although "[c]areful attention to the judgment of the Executive Branch may help inform that inquiry," "courts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Id.* Rather, "[t]he weight of [an agency's interpretation] in a particular case . . . depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.* at 2259 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). We are obliged to fulfill our obligation under Article III of the Constitution "to adjudicate 'Cases' and 'Controversies.'" *Id.* at 2257. Thus, although a court may be persuaded by an agency's interpretation, it is not bound by that interpretation; it must conduct the analysis de novo.

However, the Supreme Court also made a second point in *Loper Bright*: that its holding did not "call into question prior cases that relied on the *Chevron* framework. The holdings of those cases that specific agency actions are lawful -- including the Clean Air Act holding of *Chevron* itself -- are still subject to statutory *stare decisis* despite our change in interpretive methodology." *Id.* at 2273. In support of its determination that statutory *stare decisis* applied, the

21-11416          MARCUS, J., Concurring          6

Supreme Court cited to a prior case, *CBOCS West, Inc. v. Humphries*, 553 U.S. 442 (2008), where it affirmed on the basis of *stare decisis* a previous interpretive holding even though the prior case relied on a now-disfavored approach to statutory interpretation. *Id.* at 451, 457.

The Court explained that "[m]ere reliance on *Chevron* cannot constitute a 'special justification' for overruling [holdings relying on the *Chevron* framework], because to say a precedent relied on *Chevron* is, at best, 'just an argument that the precedent was wrongly decided.'" *Loper Bright*, 144 S. Ct. at 2273 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 266 (2014)). "That is not enough to justify overruling a statutory precedent." *Id.*

Bastias then petitioned the Supreme Court for a writ of certiorari, since *Bastias I* had been based in large measure on *Chevron*. The Supreme Court granted the writ, vacated our opinion, and remanded the case back to us. *Bastias*, 144 S. Ct. at 2705.

## II.

I begin with an explanation of the categorical approach, and detail why, as I see it, we are not bound by our decision in *Pierre*, but rather we are required to analyze de novo the basic substantive question at issue -- whether Bastias's state crime conviction for child neglect qualifies as a crime under Section 237(a)(2)(E)(i) of the INA, 8 U.S.C. § 1227(a)(2)(E)(i). Finally, I conclude that there is a

categorical match between the state crime for which Bastias stands convicted and the federal "crime of . . . child neglect."

We all agree that determining whether a state conviction qualifies as a "crime of child abuse, child neglect, or child abandonment" under the INA requires us to apply the "categorical approach." This method calls upon us to "ask[] whether the 'least culpable conduct necessary to sustain a conviction under the [state] statute'" matches the generic federal offense. *Pierre*, 879 F.3d at 1250 (quoting *Gelin v. U.S. Att'y Gen.*, 837 F.3d 1236, 1241 (11th Cir. 2016)); *see also Taylor v. United States*, 495 U.S. 575, 599 (1990) (discussing application of categorical approach to burglary statutes). The categorical approach "focuses not on the criminal conduct a defendant commits, but rather what facts are necessarily established by a conviction for the state offense." *Moncrieffe v. Holder*, 569 U.S. 184, 205 n.11 (2013) (citation modified). In this way, the categorical approach "ensures that all defendants whose convictions establish the same facts will be treated consistently, and thus predictably, under federal law." *Id.*

"Under the categorical approach, we consider only the fact of conviction and the statutory definition of the offense, rather than the specific facts underlying the defendant's case." *Gelin*, 837 F.3d at 1241. "In other words, we presume that the state conviction 'rested upon . . . the least of th[e] acts' criminalized by the statute, and then we determine whether that conduct would fall within the federal definition of the crime." *Esquivel-Quintana v. Sessions*, 581 U.S. 385, 389 (2017) (alterations in original) (quoting *Johnson v.*

*United States*, 559 U.S. 133, 137 (2010)). Bastias's state conviction therefore would match the generic federal "crime of . . . child neglect" found in the INA "only if the least of the acts criminalized by the state statute falls within the generic federal definition of" the crime. *Id.* at 390.

Moreover, we all agree about the meaning of a holding in a case. "As we've said many times, '[t]he holding of a case comprises both the result of the case and those portions of the opinion necessary to that result.'" *Finn v. Cobb Cnty. Bd. of Elections & Registration*, 111 F.4th 1312, 1317 (11th Cir. 2024) (alteration in original) (quoting *United States v. Gillis*, 938 F.3d 1181, 1198 (11th Cir. 2019) (per curiam)). Thus, the holding also consists of the rationale or reasoning necessary to reach the result of a case. *See Dana's R.R. Supply v. Att'y Gen.*, 807 F.3d 1235, 1240 n.3 (11th Cir. 2015) (noting that a statement is dicta only if it "could have been deleted without seriously impairing the analytical foundations of the holding" (quoting *Denno v. Sch. Bd.*, 218 F.3d 1267, 1283 (11th Cir. 2000) (Forrester, J., concurring in part and dissenting in part))). "Any other statements that are not necessary to the result are dicta and do not bind us." *Finn*, 111 F.4th at 1317. Moreover, "[t]he holdings of a prior decision can reach only as far as the facts and circumstances presented to the Court in the case which produced that decision." *United States v. Aguillard*, 217 F.3d 1319, 1321 (11th Cir. 2000) (per curiam) (quoting *United States v. Hunter*, 172 F.3d 1307, 1310 (11th Cir. 1999) (Carnes, J., concurring)).

It is in the application of these basic principles to *Pierre* that I disagree with my colleague and conclude that we are not bound by this Court's holding in *Pierre*.  *Pierre* was tasked with matching the federal crime of child abuse in the INA with a different state crime -- battery of a child involving bodily fluids.  As I see it, nothing in its holding, nothing in its reasoning, and nothing necessary to reaching its holding answers the basic question we face today.

In *Pierre*, the BIA reviewed an immigration judge's order applying the categorical approach in making a comparison between battery of a child involving bodily fluids under Fla. Stat. § 784.085 and the INA's definition of the federal "crime of child abuse."  The BIA conducted its analysis de novo and concluded that Pierre was removable and ineligible for cancellation of removal based on his felony conviction for battery of a child involving bodily fluids.  *Pierre*, 879 F.3d at 1245.  The federal crime of child abuse and the state crime of battery of a child involving bodily fluids required the same *mens rea* -- knowledge -- and there was also a match between the *actus reus* required for both crimes.  As for the federal crime, the BIA reasoned, a child abuse conviction "'at a minimum' . . . is one 'involving the infliction on a child of physical harm, even if slight' or 'mental or emotional harm.'"  The state law battery statute, in turn, requires the act of "[t]hrowing, tossing, projecting, or expelling personal bodily fluids or feces onto a child," which among other things "carries a significant risk that the child will be exposed to fluid-borne or fecal pathogens."  Since there was in essence a match between the *mens rea* required by both the state and federal crimes, and a match between the *actus reus* required by

21-11416                 MARCUS, J., Concurring                 10

the state and federal crimes, there was a categorical match between the two statutes, and, therefore, the BIA determined that Pierre was removable.

When Pierre petitioned for review in this Court, we addressed the same question. We defined the categorical approach, observing that it requires matching the "least culpable conduct necessary to sustain a conviction under the [state] statute" against the federal crime listed in the INA. *Id.* at 1250 (quoting *Gelin*, 837 F.3d at 1241). Turning first to the definition of the "crime of child abuse" found in the INA, we said that "[i]f an INA term or provision is undefined or ambiguous, and the BIA has interpreted that term or provision in a published, precedential decision, we defer to the BIA's interpretation under *Chevron*, as long as it reflects a permissible construction of the INA statute." *Id.* at 1249. We then observed that since the INA does not define "child abuse," and the term is ambiguous, we may defer to the BIA's interpretation so long as its interpretation was reasonable and consistent with the statute. *Id.* We quoted the BIA's broad definition of a "crime of child abuse" as "any offense involving an intentional, knowing, reckless, or criminally negligent act or omission that constitutes maltreatment of a child or that impairs a child's physical or mental well-being." *Id.* (quoting *In re Velazquez-Herrera*, 24 I. & N. Dec. 503, 517 (B.I.A. 2008)). Next, we explained the rationale the BIA used in its definition and accepted it as a reasonable one. *Id.* at 1249–51.

Finally, we compared the elements of the federal "crime of child abuse" to the elements of the state crime of battery of a child involving bodily fluids. We found that the least culpable conduct criminalized under the state statute required an *actus reus* of an overt act and a *mens rea* of knowledge, and therefore it matched the elements of the BIA's definition of a crime of child abuse found in the INA. *See id.* at 1250. The Court summarized its holding in *Pierre* this way: "[A]pplying *Chevron* deference to the definitions of 'child abuse' found in *Velazquez-Herrera* and [*In re Soram*, 25 I. & N. Dec. 378 (B.I.A. 2010)], we (1) uphold them as reasonable interpretations of the INA, to the extent they apply to Pierre's case, and (2) conclude that the BIA did not err in concluding that Pierre's conviction for battery on a child constituted a crime of child abuse." *Id.* at 1251.

We expressly limited the scope of our holding in *Pierre* at least two times. First, we observed that "[b]ecause Pierre's conviction necessarily involved a knowing and overt act, Pierre's case does not require us to determine whether purely negligent acts with no injury to the child proscribed by a state statute constitute generic crimes of child abuse." *Id.* at 1251 n.3. We recognized that our sister circuits were divided over whether the BIA's broad definition of "crime of child abuse" was overly inclusive, but we had no occasion to dive into that debate because we had no need to address or adopt that broad definition. *See id.* (comparing the Tenth Circuit's opinion in *Ibarra v. Holder*, 736 F.3d 903 (10th Cir. 2013), which "criticiz[ed] the BIA's definitions of 'child abuse' as overly inclusive" and held that a conviction under

a Colorado state statute "for criminally negligent conduct with no injury did not fit the generic federal definition of child abuse," with the Second Circuit's opinion in *Florez v. Holder*, 779 F.3d 207 (2d Cir. 2015), which "criticiz[ed] *Ibarra*" and affirmed the BIA's ruling that a conviction under a New York state statute for "'knowingly act[ing] in a manner likely to be injurious to the physical, mental or moral welfare of a child' qualified as a generic crime of child abuse" (second alteration in original) (quoting N.Y. Penal Law § 260.10(1) (McKinney 2010))). Second, we upheld the BIA's broad definition of the crime of child abuse only insofar as it applied to the circumstances surrounding Pierre's case.

Thus, the holding of *Pierre* is that, using *Chevron* deference because there is no definition of the term "crime of child abuse" in the INA, the crime of battery of a child involving bodily fluids under Florida law is a categorical "match" with the federal "crime of child abuse" found in the INA. We compared the state crime for which Pierre was convicted to the removable crime listed in the federal statute -- child abuse. Comparing the state battery crime to the federal crime of child abuse made the most sense, since the state battery crime is more than just a crime of child neglect and different from a crime of child abandonment. Again, we cabined our holding to the particular circumstances found in Pierre's case, and we declined to answer whether purely negligent conduct resulting in no injury to a child would constitute a federal crime of child abuse. Stripping away *Chevron* deference, which *Loper Bright* requires us to do, I agree with my colleague that we are required to read the holding of *Pierre* as being a de novo determination.

However, I depart from my colleague's reading of *Pierre* in a few ways. Under Judge Newsom's theory, the holding of *Pierre* is composed of two pieces: that the Court (1) accepted, in its entirety, the BIA's broad interpretation of the phrase "crime of child abuse" under *Chevron* deference, and (2) applied this accepted definition to find a match to the underlying state offense under the categorical approach. He suggests that by cabining its holding, *Pierre* did no more than "leav[e] open for a future case . . . the question how . . . *that same interpretation* would apply to a different state statute that criminalized purely negligent misconduct." In other words, *Pierre* hedged only as to the second element of its holding: the application of the definition to the underlying offense. By accepting the BIA's definition in the first instance, Judge Newsom says, *Pierre* endorsed even those parts of the BIA's interpretation that were not relevant in the underlying dispute, and we are therefore bound by the BIA's definition of "crime of child abuse." A central assumption of this reading of *Pierre* is that "the reasonableness of an administrative agency's interpretation of a statute is an all-or-nothing thing." According to my colleague, if a court found a definition reasonable under *Chevron* in one circumstance, it necessarily endorsed the definition in all circumstances, since "it makes no sense to say that an agency's interpretation of a statute is reasonable with respect to some concrete applications" but not others.

I necessarily read the holding of *Pierre* more narrowly than my colleague does. I do not agree that under *Chevron*, the panel in *Pierre* was required to accept the entirety of the BIA's definition to reach its ultimate conclusion. Agency interpretations of statutory

language are often multifaceted, and not all aspects of a proffered definition are implicated in every dispute. Just as a holding includes those portions of the opinion that are necessary to reach the result, *Gillis*, 938 F.3d at 1198, it has remained a cardinal principle of judicial restraint that where "it is not necessary to decide more, it is necessary not to decide more." *Dean v. Warren*, 12 F.4th 1248, 1263 (11th Cir. 2021) (quoting *PDK Lab'ys, Inc. v. U.S. Drug Enf't Admin.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment)). In an ordinary case of statutory interpretation, a reviewing court should address only the portions of the statute that are relevant to the underlying dispute. Nothing in *Chevron* changed this obligation. *Chevron* did no more than grant courts a new tool of deference to review the lawfulness of an agency's action. *See Loper Bright*, 144 S. Ct. at 2264 (explaining that *Chevron* "articulated and employed a now familiar two-step approach broadly applicable to review of agency action"). As I see it, that tool did not change the obligation of a reviewing court to explicate a holding tailored to the underlying dispute, despite its use of binary "yes-no questions" at each stage of analysis. Otherwise, a court applying *Chevron* would have been required to issue advisory opinions on the reasonableness of agency statutory interpretations that were never at issue.

As exemplified by the holding of *Pierre*, it was perfectly appropriate for a reviewing court applying *Chevron* to determine that, on the facts before it, the contested portion of the agency's definition was reasonable, and to defer to its interpretation. Consider what the panel in *Pierre* did and did not say in its analysis

under the categorial approach.  On the state crime side of the matching equation, *Pierre* did not construe the Florida statute at issue today.  *Pierre* had no occasion to tell us what the crime of "child neglect" under Florida Statute § 827.03 means.  *Pierre* did not look at the state crime of child neglect, since the petitioner had been convicted of the crime of battery of a child involving bodily fluids.  Indeed, if *Pierre* had explicated the meaning of "child neglect," that commentary would have been dicta wholly unnecessary to its holding.

In fact, the elements of the two state criminal statutes are completely different: the Florida battery statute requires that a person "knowingly cause or attempt to cause a child to come into contact with blood, seminal fluid, or urine or feces by throwing, tossing, projecting, or expelling such fluid or material."  Fla. Stat. § 784.085(1).  Thus, to sustain a conviction for battery, this requires: (1) a *mens rea* of knowledge; (2) causing or attempting to cause a child to come into contact with blood, seminal fluid, urine, or feces; and (3) throwing, tossing, projecting, or expelling blood, seminal fluid, urine, or feces.  *See id.*; *accord* Fla. Standard Crim. Jury Instructions § 8.33.

In contrast, Florida's criminal child neglect statute, for which Bastias stands convicted, requires proving that a person "willfully or by culpable negligence neglects a child without causing great bodily harm, permanent disability, or permanent disfigurement to the child."  Fla. Stat. § 827.03(2)(d). The elements of the crime of child neglect are: (1) a *mens rea* of willfulness or

21-11416                MARCUS, J., Concurring                16

culpable negligence; (2) a failure to provide a child with the care, supervision, and services necessary to maintain his physical or mental health; and (3) the absence of great bodily harm, permanent disability, or permanent disfigurement. *See id.*; *accord* Fla. Standard Crim. Jury Instructions § 16.6.

On the federal side of the equation, *Pierre* expressly chose not to adopt the broad definition of "crime of child abuse" used by the BIA in *Velazquez-Herrera* and *Soram* because there was no need to. Again, remember the breadth of the BIA's definition of the "crime of child abuse": it includes any offense involving intentional, knowing, reckless, or criminally negligent acts or omissions that constitute the maltreatment of a child, or impair a child's physical or mental well-being, including sexual abuse or exploitation, and its definition of the crime of child abuse did not require actual harm or injury. But because Pierre's state conviction necessarily involved both a knowing and an overt act, *Pierre* had no need to determine whether a state crime involving only criminal negligence that resulted in no injury to a child constituted the federal crime of child abuse.

On *Pierre*'s own terms, its adoption of the BIA's definition of the "crime of child abuse" was not complete or all-encompassing: it declined to endorse those parts of the BIA's interpretation that went beyond a *mens rea* of knowledge and an *actus reus* of an overt act yielding an actual harm to the child. *Pierre* adopted only those parts of the BIA's broad definition "to the extent they apply to Pierre's case." *Pierre*, 879 F.3d at 1251. Any other parts of the BIA's

definition, such as the inclusion of noninjurious, purely negligent acts, were "not necessary to the result . . . and do not bind us." *Finn*, 111 F.4th at 1317. The view that accepting the BIA's definition "supplied the major premise" of the *Pierre* panel's logic, then, is only half right. *Pierre* accepted only part of the BIA's definition, which formed the premise needed to match the definition to the underlying Florida child battery crime. Thus, the most that can be said of the holding in *Pierre* is that there is a match under the categorical approach between the state crime of battery of a child involving bodily fluids and the federal crime of child abuse. That is the principle holding we are obliged to follow in the wake of *Loper Bright*. *See Loper Bright*, 144 S. Ct. at 2273.

My colleague suggests that the *Chevron*-era "holdings" preserved by the Court in *Loper Bright* must always include the past court's "antecedent determination that the agency's reading of the governing statute was 'lawful,'" not just the "case-specific application of a judicially approved agency interpretation to a particular set of facts." Once more, this strikes me as only half right. The theory risks saying too much and taking *Loper Bright* too far, enabling *Chevron*, which is now a dead letter, to continue to cast a long shadow over our understanding of prior decisions. In conjunction with my colleague's all-or-nothing interpretation of *Chevron*, this reading would transform dicta on agency definitions into binding precedent through the vehicle of statutory *stare decisis*. To my thinking, the better reading is that a holding under *Loper Bright* is precisely what we have always read it to mean: "the result of the case and those portions of the opinion necessary to that

21-11416                 MARCUS, J., Concurring                 18

result." *Finn*, 111 F.4th at 1317 (quoting *Gillis*, 938 F.3d at 1198). To the extent, then, that a *Chevron*-era decision found an agency's definition to be reasonable, and to the extent that finding was necessary to resolve the case, that finding is part of the holding and remains good law. And where, as in the Clean Air Act example my colleague cites, an agency's full definition is accepted to reach the result, the holding preserved by *Loper Bright* sweeps more broadly. The critical question is whether the *Chevron*-era court adopted an agency's proffered reading in full.

*Pierre* did not do so. It plainly did not consider itself to be applying the all-or-nothing reading of *Chevron* deference that my colleague advances. Instead, it accepted the BIA's definition only "to the extent [it] appl[ies] to Pierre's case," a finding preserved by *Loper Bright*. *Pierre*, 879 F.3d at 1251. As explained, the panel was correct to limit its review based on the facts before it. But even if *Pierre* misapplied *Chevron* or otherwise erred in cabining its holding, we would still be obliged under the prior panel precedent rule to adhere to *Pierre*'s holding until the panel's decision is abrogated en banc or by the Supreme Court. *See United States v. Fritts*, 841 F.3d 937, 942 (11th Cir. 2016) ("Under this Court's prior panel precedent rule, there is never an exception carved out for overlooked or misinterpreted Supreme Court precedent."). Accordingly, I do not believe *Pierre* provides the rule of decision here, or even helps us compare the state crime Bastias was convicted of -- the crime of child neglect -- to the crimes embodied in the INA.

**III.**

21-11416               MARCUS, J., Concurring               19

Since neither *Pierre* nor *Chevron* binds us in any way, we are required to apply the categorical approach de novo. Moreover, *Bastias I* is not binding on us either, because it was vacated by the Supreme Court and remanded to us. *See United States v. Sigma Int'l, Inc.*, 300 F.3d 1278, 1280 (11th Cir. 2002) (en banc) (per curiam) (stating that vacated opinions "are officially gone. They have no legal effect whatever. They are void. None of the statements made in . . . them has any remaining force and cannot be considered to express the view of this Court."); *Iranian Students Ass'n v. Edwards*, 604 F.2d 352, 354 n.4 (5th Cir. 1979)[1] ("[V]acating . . . [a] decision deprives it of precedential value."); *O'Connor v. Donaldson*, 422 U.S. 563, 577 n.12 (1975) ("Of necessity our decision vacating the judgment of the Court of Appeals deprives that court's opinion of precedential effect, leaving this Court's opinion and judgment as the sole law of the case.").

The question before us, then, is whether there is a match between the state crime of child neglect and the federal crimes against children found in the INA. In this case, I think the better and more refined comparison is made between the state crime of child neglect under Fla. Stat. § 827.03(2)(d) and the federal crime in the INA using the exact same language -- the "crime of . . . child neglect" under 8 U.S.C. § 1227(a)(2)(E)(i). Today, we need go no further than making the comparison between the state crime of

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), we adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981. *Id.* at 1209.

21-11416                MARCUS, J., Concurring                20

child neglect and the federal crime of child neglect. We have no need to explore the difficult interpretive questions surrounding the scope and meaning of the generic "crime of child abuse." After all, the categorical approach asks whether the state crime matches the "generic federal definition of a *corresponding* [crime]." *Esquivel-Quintana*, 581 U.S. at 389 (emphasis added) (citation modified). Merriam-Webster Dictionary defines "corresponding," among other things, as "related, accompanying." *Corresponding*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/corresponding (last visited Oct. 28, 2025). Since Bastias's state conviction was for the crime of child neglect, the logical, corresponding, or related generic federal crime is the "crime of . . . child neglect" found in the INA. Although a definition of a "crime of child abuse" might encompass the crime of child neglect and more, we have no occasion to make that comparison because in this case, we find the same words enumerating the same crime -- the crime of child neglect -- on both sides of the ledger.

Turning, then, to the match, I conclude that the state crime for which Bastias was convicted corresponds to the federal generic crime found in the INA, because both statutes require a *mens rea* of recklessness or higher and an *actus reus* of creating at least a risk of real harm to a child. Again, "[u]nder the categorical approach, we consider only the fact of conviction and the statutory definition of the offense, rather than the specific facts underlying the defendant's case." *Gelin*, 837 F.3d at 1241. This process, in turn, requires determining what type of harm and *mens rea* are necessary to

sustain a conviction for each offense. I agree with much of my colleague Judge Middlebrooks's analysis in conducting the match, but I would explain the match in slightly different terms.

## A.

I address first what conduct (*actus reus*) and what *mens rea* are required to sustain a conviction for child neglect under the Florida penal code. Based on my reading of the text and Florida's case law, the state crime of child neglect requires at a minimum conduct creating a risk of serious harm or death to a child, rather than conduct inflicting actual harm, along with at least a *mens rea* of recklessness.

It is undisputed that the "least culpable conduct" under Fla. Stat. § 827.03(2) is found in subsection (d), which states, "A person who . . . by culpable negligence neglects a child without causing great bodily harm, permanent disability, or permanent disfigurement to the child commits a felony of the third degree . . . ." Fla. Stat. § 827.03(2)(d).

Turning first to the harm required to sustain a conviction under this section of the statute, the "least culpable conduct" criminalized does not require inflicting any actual harm to the child. Subsection (d) speaks of neglecting a child and *not* causing great bodily harm, permanent disability, or permanent disfigurement to the child. *Id.* This must mean that the statute envisions the criminalization of conduct that may cause only minor harm to the child or no harm at all. And if there be any doubt about this, the statute defines "[n]eglect of a child" to include

"a single incident or omission that results in, or could reasonably be expected to result in, serious physical or mental injury, or a substantial risk of death, to a child." *Id.* § 827.03(1)(e). Because the statute covers conduct that "could reasonably be *expected* to result in . . . injury," *id.* (emphasis added), it necessarily encompasses culpable conduct that may not result in actual injury. Thus, to be convicted of child neglect under Fla. Stat. § 827.03(2)(d), a defendant need not have caused actual harm to the child; but he must have done something or failed to do something that could reasonably be expected to result in serious injury or a substantial risk of death to the child. The Florida case law is consistent with this interpretation. *See, e.g.*, *Arnold v. State*, 755 So. 2d 796, 797 (Fla. 2d DCA 2000) ("[T]he legislature has required that the defendant's acts or omissions create a 'reasonably expected' potential for the child to suffer, at a minimum, serious injury."); *see also State v. Sammons*, 889 So. 2d 857, 860 (Fla. 4th DCA 2004).

Turning next to the *mens rea* required to sustain a conviction for child neglect, the least culpable conduct found in the statute requires a *mens rea* of "culpable negligence." The Supreme Court of Florida has, for many years now, defined culpable negligence for the crime of manslaughter as "consciously doing an act or following a course of conduct that the defendant must have known or reasonably should have known was likely to cause death or great bodily injury." *McCloud v. State*, 209 So. 3d 534, 541 (Fla. 2017).

Indeed, the Supreme Court of Florida has repeatedly and consistently defined culpable negligence over the years in terms

21-11416              Marcus, J., Concurring              23

that resemble recklessness.  As long ago as 1939, Florida's high court explained that culpable negligence for manslaughter requires proving "a gross and flagrant character, evincing reckless disregard of human life or of the safety of persons exposed to its dangerous effects; or that entire want of care which would raise the presumption of indifference to consequences; or such wantonness or recklessness or grossly careless disregard of the safety and welfare of the public, or that reckless indifference to the rights of others, which is equivalent to an intentional violation of them." *Russ v. State*, 191 So. 296, 298 (Fla. 1939).  And in *Preston v. State*, 56 So. 2d 543 (Fla. 1952), the Supreme Court of Florida again wrote that culpable negligence "must be of 'a gross and flagrant character, evincing reckless disregard of human life or of the safety of persons exposed to its dangerous effects; or that entire want of care which would raise the presumption of indifference to consequences; or such wantonness or recklessness or grossly careless disregard of the safety and welfare of the public, or that reckless indifference to the rights of others, which is equivalent to an intentional violation of them." *Id.* at 544 (quoting *Savage v. State*, 11 So. 2d 778, 779 (Fla. 1943)).  More recently, in *State v. Greene*, 348 So. 2d 3 (Fla. 1977), the Supreme Court of Florida repeated that "reckless indifference or grossly careless disregard of the safety of others is necessary to prove 'culpable negligence.'" *Id.* at 4.  It elaborated: "Whether members of the public would describe reckless acts which create a great risk of danger to others as culpable negligence or not, they know that such acts are criminally outlawed." *Id.*

21-11416                MARCUS, J., Concurring                24

Notably, the Supreme Court of Florida has applied the same definition for culpable negligence -- the requirement that the conduct be reckless, consciously creating a great risk of danger to others -- to cases involving crimes against children. *See, e.g.*, *State v. Joyce*, 361 So. 2d 406, 407 (Fla. 1978) (citing to *Greene*, a manslaughter case, when discussing the culpable negligence requirement for the state crime of child abuse). "Where the highest court -- in this case, the Florida Supreme Court -- has spoken on the topic, we follow its rule." *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1348 (11th Cir. 2011).

The Florida District Courts of Appeal have also applied this definition of culpable negligence in criminal child neglect cases, either using language that resembles recklessness or invoking recklessness outright. *See, e.g.*, *Taylor v. State*, 363 So. 3d 126, 130 (Fla. 1st DCA 2023) ("For negligence to be called culpable negligence, it must be gross and flagrant. The negligence must be committed with an utter disregard for the safety of others. Culpable negligence is consciously doing an act or following a course of conduct that the defendant must have known, or reasonably should have known, was likely to cause death or great bodily harm." (quoting *Kish v. State*, 145 So. 3d 225, 227–28 (Fla. 1st DCA 2014))); *Ristau v. State*, 201 So. 3d 1254, 1257 (Fla. 2d DCA 2016) ("This court has defined culpable negligence as 'consciously doing an act which a reasonable person *would know is likely* to result in death or great bodily harm to another person, even though done without any intent to injure anyone but with *utter disregard* for the safety of another.'" (quoting *Arnold*, 755 So. 2d at 798)); *Hill v. State*,

21-11416                 MARCUS, J., Concurring                 25

846 So. 2d 1208, 1214 (Fla. 5th DCA 2003) ("Proof of [the crime of child neglect] requires the state to establish a high degree of culpability on the part of the defendant, equivalent to the kind of wanton and reckless behavior necessary to prove manslaughter or punitive damages.").

What's more, we know that culpable negligence requires more than simple negligence from an examination of the legislative and judicial history surrounding Florida's criminal child neglect statute. In *State v. Winters*, 346 So. 2d 991 (Fla. 1977), the Supreme Court of Florida ruled that the 1975 predecessor of Florida's criminal child neglect statute, which required only a *mens rea* of simple negligence, was unconstitutional. *Id.* at 994. The court explained that unlike requiring that a defendant's action "be willful []or culpably negligent," the lesser requirement of simple negligence meant that "[c]riminal penalties may be inflicted on anyone who, by an act of commission or omission involving only simple negligence, fails to meet the nebulous test of what is necessary," rendering the statute unconstitutional for vagueness. *Id.* at 993–94. In its amendment to the Florida criminal child neglect statute in 1991, the Florida legislature added additional requirements to the statute but did not change the simple negligence *mens rea* requirement, leading Florida's appellate courts, once again, to find the statute unconstitutional. *See State v. Mincey*, 658 So. 2d 597, 598 (Fla. 4th DCA 1995); *State v. Ayers*, 665 So. 2d 296, 297 (Fla. 2d DCA 1995); *Arnold*, 755 So. 2d at 797. In response to these judicial rulings, the Florida legislature finally amended the statute in 1996 to require a *mens rea* of willfulness or culpable

negligence, which has remained a requirement to this day. *See Arnold*, 755 So. 2d at 797–98; Fla. Stat. § 827.03.

In light of the legislative history surrounding Florida's criminal child neglect statute, and Florida's case precedent defining culpable negligence as requiring recklessness or some comparable version of the conscious disregard of the substantial risk of injury or death, I conclude that the lowest *mens rea* for culpable negligence found in Fla. Stat. § 827.03(2)(d) is recklessness. *See* Model Penal Code § 2.02(2)(c) ("A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct."); 1 Wharton's Criminal Law § 5:6 (16th ed. 2025) ("The reckless actor is aware of the risk and consciously disregards it.").

### B.

The next step in the matching process requires us to determine what federal crime enumerated in the INA we should compare to Bastias's state conviction for child neglect. As I've said, I would focus on the federal "crime of . . . child neglect" standing alone, rather than making the comparison to the enumerated bundle of crimes against children found in the INA ("child abuse, child neglect, or child abandonment"). Making the match this way is easier and more direct; it compares crimes on both sides of the equation that use precisely the same words; and it avoids the

21-11416                MARCUS, J., Concurring                27

unnecessary task of divining the meaning of the broader generic "crime of child abuse."[2]

I begin with the text. *See Ross v. Blake*, 578 U.S. 632, 638 (2016) ("Statutory interpretation, as we always say, begins with the text . . . ."). The text of the statute reads this way: "Any alien who at any time after admission is convicted of a crime of domestic violence, a crime of stalking, or a crime of child abuse, child neglect, or child abandonment is deportable." 8 U.S.C. § 1227(a)(2)(E)(i). Our focus, of course, is on the enumerated bundle of crimes against the child -- a "crime of child abuse, child neglect, or child abandonment."

---

[2] The case law drawn from our sister circuits does not help us decide what the proper federal crime of comparison ought to be in this case. Before the Supreme Court decided *Loper Bright*, uniformly, the cases applying the categorical approach to assess whether an immigrant was deportable under 8 U.S.C. § 1227(a)(2)(E)(i) compared a variety of state crimes involving a child with a unitary concept bundling together these federal crimes against a child. This is unsurprising since the federal courts were still required to defer to the BIA's broad definition of a "crime of child abuse" if they found ambiguity in the statute. *See, e.g.*, *Florez v. Holder*, 779 F.3d 207, 211–12 (2d Cir. 2015); *Mondragon-Gonzalez v. Att'y Gen.*, 884 F.3d 155, 158–59 (3d Cir. 2018); *Garcia v. Barr*, 969 F.3d 129, 133–34 (5th Cir. 2020). More recently, the Fourth and Fifth Circuits have applied the categorical approach to match up certain state crimes against children to the crime of child abuse found in the INA, but the relevant state crimes in each of those cases -- sexual abuse of a minor and online solicitation of a minor -- plainly were crimes of child abuse, not crimes of child neglect or child abandonment. *See Cruz v. Garland*, 101 F.4th 361, 363 (4th Cir. 2024); *Sandoval Argueta v. Bondi*, 137 F.4th 265, 268 (5th Cir. 2025).

21-11416                MARCUS, J., Concurring                    28

I start by giving the words in the statute their ordinary meaning. *See, e.g.*, *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1481–82 (2021) ("[U]ntil and unless someone points to evidence suggesting otherwise, . . . courts . . . are entitled to assume statutory terms bear their ordinary meaning."); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 69 (2012) ("Words are to be understood in their ordinary, everyday meanings . . . ."). The parties observe that, based on the introductory phrase "a crime of" in the INA, the BIA has understood the phrase "a crime of child abuse, child neglect, or child abandonment" to be a unitary concept, which sweeps in all three categories of offenses into one amorphous bundle. *See In re Soram*, 25 I. & N. Dec. at 380–81; *Cruz*, 101 F.4th at 363. In my view, the better reading is that the ordinary meanings conveyed by these terms are distinct, even if they overlap in some ways.

In essence, child neglect suggests the failure to fulfill a duty imposed by law that creates a risk of harm to a child, *see* Merriam Webster's Dictionary of Law 324 (1996) ("a disregard of duty resulting from carelessness, indifference, or willfulness; *esp*: a failure to provide a child under one's care with proper food, clothing, shelter, supervision, medical care, or emotional stability."). Child abuse suggests a broader nature of offending conduct including a variety of sins against a child, *see Child Abuse*, Black's Law Dictionary (6th ed. 1990) ("Any form of cruelty to a child's physical, moral or mental well-being."); while child abandonment, in turn, suggests a different kind of crime, that is, one leaving a child without an intent to return, *see Abandonment*,

21-11416                MARCUS, J., Concurring                29

Black's Law Dictionary (6th ed. 1990) ("Desertion or willful forsaking.").

What's more, we have been taught repeatedly that under the surplusage canon, "[i]f possible, every word and every provision is to be given effect . . . . None should be ignored. None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence." Scalia & Garner, *Reading Law*, at 174. "The canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme." *City of Chicago v. Fulton*, 141 S. Ct. 585, 591 (2021) (quoting *Yates v. United States*, 574 U.S. 528, 543 (2015) (plurality opinion)). Congress chose to enumerate three separate crimes against children -- abuse, neglect, and abandonment. Although they may overlap in some ways, I do not think we should read this bundle of child crimes as being singular. "[W]e must presume that Congress said what it meant and meant what it said." *United States v. Steele*, 147 F.3d 1316, 1318 (11th Cir. 1998) (en banc). I think it is easier, at least for our purposes, and wiser to compare the state crime of child neglect to one of the enumerated federal crimes set out by Congress as a separate and distinct crime.

I also note that Congress chose to list these federal crimes in the disjunctive. Again, the statute references "a crime of child abuse, child neglect, *or* child abandonment." 8 U.S.C. § 1227(a)(2)(E)(i) (emphasis added). And "[a]s 'a general rule, the use of a disjunctive in a statute indicates alternatives and requires that those alternatives be treated separately.'" *Brown v. Budget Rent-*

*A-Car Sys., Inc.*, 119 F.3d 922, 924 (11th Cir. 1997) (per curiam) (quoting *Quindlen v. Prudential Ins. Co. of Am.*, 482 F.2d 876, 878 (5th Cir. 1973)).  Congress used the disjunctive "or" when it listed three crimes against children, so it seems to me to be perfectly reasonable for matching purposes to read each of these crimes as distinct, each rendering an alien deportable.  And although the heading in 8 U.S.C. § 1227(a)(2)(E)(i) says, "Domestic violence, stalking, and child abuse," and it does not list child neglect or child abandonment, that does not affect my interpretive conclusion because "[w]here [the] statutory text and title are inconsistent, we go with the text." *Kanapuram v. Dir., USCIS*, 131 F.4th 1302, 1308 (11th Cir. 2025); *see also Brotherhood of R.R. Trainmen v. Balt. & Ohio R.R. Co.*, 331 U.S. 519, 528–29 (1947) ("[T]he title of a statute and the heading of a section cannot limit the plain meaning of the text.").  Congress, after all, could have limited the words it used in the text of the statute to just the "crime of child abuse," but it chose to separately enumerate the crimes of "child neglect" and "child abandonment" as well.

In any event, even assuming *arguendo* that the phrase "a crime of child abuse, child neglect, or child abandonment" refers to an all-encompassing unitary concept under the broad offense of "child abuse," it would still be correct to focus on the crime of "child neglect," because the unitary concept of abuse sweeps in all of the crimes included in the INA.  Put differently, as my colleague Judge Middlebrooks observes, even if "[the] broad definition of child abuse describes the entire phrase," *In re Soram*, 25 I. & N. Dec. at 381, the bundle of offenses contained within a "crime of child

21-11416                MARCUS, J., Concurring                31

abuse" would necessarily include child neglect, just as it would also include child abandonment. Thus, regardless of whether the "crime of child abuse, child neglect, or child abandonment" found in the INA is read as a unitary concept or as a list of three individual crimes, the appropriate question is whether the Florida child neglect statute fits the meaning of "child neglect" under the INA. In either case, the same phrase -- "child neglect" -- is central to both the state and federal offense.

Having concluded that the correct match here is between the Florida crime of conviction and the INA-enumerated "crime of . . . child neglect," our task is to divine the meaning of this generic federal crime.

Turning first to the *actus reus* required by the generic "crime of . . . child neglect" found in the INA, again, I begin with the ordinary meaning of the term at the time this provision was added to the INA. *See Bostock v. Clayton County*, 140 S. Ct. 1731, 1750 (2020) (stating that "the law's ordinary meaning at the time of enactment usually governs"); Scalia & Garner, *Reading Law*, at 69 ("Words are to be understood in their ordinary, everyday meanings . . . ."); *id.* at 78 ("Words must be given the meaning they had when the text was adopted."). The plain meaning of the term "neglect" encompasses conduct that creates a risk of harm as well as conduct that actually inflicts harm. Contemporaneous dictionaries defined "neglect" in various ways:

- "the act or condition of disregarding"; "[n]eglect indicates, as a purely objective fact,

that a person has not performed a duty." Bryan A. Garner, *A Dictionary of Modern Legal Usage* 585 (2d ed. 1995) (emphasis omitted);

- "a disregard of duty resulting from carelessness, indifference, or willfulness; *esp*: a failure to provide a child under one's care with proper food, clothing, shelter, supervision, medical care, or emotional stability." Merriam-Webster's Dictionary of Law 324 (1996);

- "failure to do or perform some work, act, or duty, required by one's status or by law." Ballentine's Law Dictionary (1994);

- "to omit, fail, or forbear to do a thing that can be done, or that is required to be done, but it may also import an absence of care or attention in the doing or omission of a given act. And it may mean a designed refusal, indifference, or unwillingness to perform one's duty." Black's Law Dictionary (6th ed. 1990).

As these definitions explain, the kind of harm required by the "crime of . . . child neglect," is conduct that creates a risk of harm, as well as conduct that inflicts actual harm. The definitions also explain that child neglect involves the failure to do something for a child that is required by law. The definition in Merriam-Webster's Dictionary lists specific things that someone has failed to provide to a child that do not directly result in harm -- such as

proper supervision -- thereby contemplating a risk of harm because of a person's failure to perform his duty.

Other dictionary definitions also contemplate that child neglect encompasses conduct that creates a risk of harm. Thus, for example, the definition found in Black's Law Dictionary includes "an absence of care or attention," which would create a risk of harm even without causing actual harm to a child. Likewise, the definition in Ballentine's Law Dictionary ties the failure to act as required to "one's status," which in the context of child neglect and someone with a duty to a child, could be interpreted as creating at least a risk of harm to the child; after all, a person who has a legal duty to a child generally creates, at the very least, a risk of harm to the child if he fails to fulfill that duty.

Bastias argues, however, citing the rule of *ejusdem generis*, that based on the severity of the other crimes with which it is listed and with which it should be read together -- specifically, domestic violence and stalking -- the "crime of . . . child neglect" should include only conduct that actually harms a child and not conduct that only creates a risk of harm, since that conduct is insufficiently severe to be considered alongside the other crimes.

The argument is unconvincing because "a crime of child abuse," "a crime of . . . child neglect," or "a crime of . . . child abandonment" could be as severe as "a crime of stalking" even in the absence of actual harm, depending on the degree of risk created and the severity of the potential harm. Even accepting as true that actual injury may be related to how severe neglectful

conduct is, neglectful conduct may nonetheless be very severe even in the absence of actual injury.  Thus, for example, an adult could place a child in a dangerous situation that has a high risk of serious injury or death but where, due to sheer luck, no actual injury occurs, like where a driver of a car leaves a six-month-old child in the back seat of the car when the temperature exceeds 85 degrees and goes into the store to shop for some time.  In that scenario, the adult would have been "severely" neglectful -- even if no injury actually occurs -- in light of the very substantial risk of causing serious bodily injury or death.  Whether or not a child suffers an actual injury is a different inquiry from how severe child neglect may be: that is, the risk of injury could be very high and injury could be avoided due only to sheer luck, yet the "crime of . . . child neglect" would still be a very severe one.  Put differently, it may be true that the "crime of child abuse, child neglect, or child abandonment" criminalizes only severe conduct, but such severe conduct may include conduct that creates a serious and substantial risk of bodily harm or death to a child as well as conduct resulting in actual harm.

I am also unpersuaded by Bastias's other argument -- that the generic federal crime of child neglect requires the defendant to be the child's parent or guardian.  In fact, the dictionary definitions of "neglect" do not require a parental or parent-like duty at all.  Thus, for example, the definition Merriam-Webster's Dictionary of Law defines neglect as a failure to provide a child "under one's care" with his physical or emotional needs and does not limit the definition to parents or guardians caring for a child.  Similarly, the

definition in Ballentine's Law Dictionary refers to a failure to do something that is required by "one's status or by law," again including in its ambit not just parents or those like parents. These definitions of child neglect include within their scope all people who have a duty to take care of children, not just parents or guardians.

Turning, then, to the next issue, the *mens rea* actually required by the generic federal crime of child neglect is recklessness or higher. Beginning with the plain meaning of "neglect" or "child neglect," the contemporaneous dictionary definitions do not help us discern what specific *mens rea* is required for a generic crime of child neglect. Thus, as we've seen, the entry for "neglect" in Black's Law Dictionary includes "willful neglect" as a related entry, clearly envisioning that the *mens rea* for neglect could be willful. *Neglect*, Black's Law Dictionary (6th ed. 1990). On the other hand, Garner's Dictionary of Modern Legal Usage says that neglect "does not necessarily involve *negligence*. For example, 'neglect of a child' may be either negligent or willful." Garner, *A Dictionary of Modern Legal Usage*, at 585. Because the dictionary definitions of "neglect" and "child neglect" reference various levels of *mens rea*, it is unclear at least based on a dictionary definition what specific level of *mens rea* is encompassed by "a crime of . . . child neglect." 8 U.S.C. § 1227(a)(2)(E)(i). For similar reasons, our recognition in *Bastias I* that "neglect" and "negligence" derive from the same Latin root, *neglegere*, does not help us determine what level of *mens rea* is required to sustain a conviction for the crime of child neglect in the

21-11416                    MARCUS, J., Concurring                    36

INA, inasmuch as neglect can encompass different levels of *mens rea*. *See Bastias I*, 42 F.4th at 1275.

We need not dive too deeply into this issue, however, because Bastias acknowledges that a *mens rea* of recklessness is sufficient to sustain a conviction on the federal side of the equation. The Petitioner argues that the generic federal crime of child neglect "require[s] at least recklessness," and he never makes the argument that the crime requires a higher *mens rea* such as intent or knowledge. Accordingly, recklessness found in Florida's criminal child neglect statute is sufficient to match the *mens rea* of recklessness required by the generic federal crime of child neglect.

In a footnote, my colleague Judge Newsom questions whether this conclusion "overread[s]" Bastias's brief, surmising that Bastias may have intended to do no more than "rul[e] out negligence" rather than "conced[e] recklessness." In my view, this hinges on a strained reading of the brief's plain language. The brief reads this way: "That reasoning ignores Mr. Bastias's argument that 'child abuse' *does* require harm and 'child neglect' *does* require at least recklessness and a parent-like duty—so negligent, non-injurious conduct falls within neither term." By summarizing his position as one where "child neglect" "require[s] at least recklessness," Bastias recognizes recklessness to be the irreducible minimum of the generic offense's *mens rea*. This is the grammatical and logical conclusion borne out by various dictionary definitions of the term "at least." *See, e.g.*, *Least*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/at%20least  (last

21-11416                MARCUS, J., Concurring                37

visited Oct. 28, 2025) (defining "at least" as "at the minimum"); *Least*, Oxford English Dictionary, https://www.oed.com/dictionary/least_adj?tab=meaning_and_use#1223232300 (last visited Oct. 28, 2025) (defining "at least" as "indicating that the amount is the smallest admissible or is otherwise a minimum"). This definition applies with equal force regardless of whether the referent is numerical or conceptual. In either case, "at least" is the lowest permissible amount—anything more is allowed, anything less is not. What's more, in numerous contexts the phrase "at least" indicates the irreducible minimum. Thus, for example, Article I of the Constitution states that "each State shall have at Least one Representative," meaning one or more representatives. U.S. Const. art I, § 2, cl. 3. Likewise, the Twentieth Amendment states that "[t]he Congress shall assemble at least once every year," meaning that it may assemble once per year, or it may assemble more than once per year. *Id.* amend. XX, § 2; *see also Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed. Cir. 1999) ("Use of the phrase 'at least one' means that there could be only one or more than one." (citation omitted)). This reading is again bolstered by the position Bastias has taken throughout these proceedings. He has never suggested or even remotely hinted that the crime of child neglect requires a *mens rea* of knowledge or intent. Recklessness is quite enough.

Judge Newsom also suggests that we need not adopt Bastias's concession -- even if the concession is clear -- where the concession may be erroneous. As the Second Circuit has observed, "[w]hen a party makes a concession on appeal as to an issue of law

21-11416                MARCUS, J., Concurring                38

or fact," a court "typically accept[s] or assume[s] the accuracy of the concession without question. This practice permits the parties to frame the litigation . . . . [and grants] flexibility in [the court's] decision-making process." *D.S. ex rel. M.S. v. Trumbull Bd. of Educ.*, 975 F.3d 152, 162 (2d Cir. 2020). We have explained, however, that "there is a difference between concessions about the law and those about how the law applies and the result it produces given the facts of a specific case." *Nesbitt v. Candler County*, 945 F.3d 1355, 1357–58 (11th Cir. 2020). Where the concession involves a question of law, such as the interpretation of a statute, we need not take it wholly at face value. *See Bourdon v. U.S. Dep't of Homeland Sec.*, 940 F.3d 537, 547 n.6 (11th Cir. 2019) ("[T]he Government cannot concede away the proper interpretation of a statute . . . .").

Nevertheless, a party's concession on a point of law may supply grounds to affirm what is otherwise a sound conclusion. *See Roberts v. Galen of Va., Inc.*, 525 U.S. 249, 253 (1999) (per curiam) ("Although the concession of a point on appeal by respondent is by no means dispositive of a legal issue, we take it as further indication of the correctness of our decision today . . . ."). And as my colleague Judge Middlebrooks observes, nothing in the text of the INA demands a *mens rea* higher than recklessness. *See Diaz-Rodriguez v. Garland*, 55 F.4th 697, 741 (9th Cir. 2022) (Collins, J., concurring in part and concurring in the judgment) (reviewing the INA de novo and concluding "there is a compelling textual reason not to construe 'crime . . . of child neglect' as requiring either knowledge or intent. The operative term, after all, is 'neglect,' and the relevant offense is the '*crime* of . . . child *neglect*.' 'Nothing' in

21-11416                MARCUS, J., Concurring                39

that language 'indicates that [it] applies exclusively to knowing or intentional' acts or omissions." (second alteration in original) (quoting *Voisine v. United States*, 579 U.S. 686, 692 (2016)).  Bastias's concession is a wise one, then, since it tracks the best reading of the statute.    It is therefore perfectly fair to hold Bastias to his unambiguous concession.

In short, the generic federal crime of child neglect requires a *mens rea* of recklessness and conduct creating a risk of harm to a child, which matches the *mens rea* and conduct needed for the "least culpable conduct" criminalized under Bastias's Florida statute of conviction.  Thus, as I see it, there is a categorical match between the Florida state crime and the federal crime found in the INA, and therefore I agree with my colleagues that Bastias's Petition for Review must be denied.

21-11416          MIDDLEBROOKS, J., Concurring                    1

MIDDLEBROOKS, District Judge, concurring in the judgment:

In 1996, Congress amended the Immigration and Nationality Act (the "INA") to impose severe immigration consequences on noncitizens convicted of specific child-related offenses. Namely, the INA renders removable all persons convicted of a "crime of child abuse, child neglect, or child abandonment." 8 U.S.C. § 1227(a)(2)(E)(i). Congress did not supply a statutory definition for this provision, requiring courts and the Board of Immigration Appeals (the "Board") to fill in the gaps. The Board's definition of a "crime of child abuse" has shifted several times since the 1996 amendments were implemented, but under its most recent iteration, the Board's proffered reading covers "any offense involving an intentional, knowing, reckless, or criminally negligent act or omission that constitutes maltreatment of a child or that impairs a child's physical or mental well-being." *Matter of Soram*, 25 I. & N. Dec. 378, 380 (BIA 2010) (quoting *Matter of Velazuez-Herrera*, 24 I. & N. Dec. 503, 512 (BIA 2008)).

Previously, in reading the INA we have deferred to the Board, as was required by the legal regime of *Chevron, U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See Bastias v. U.S. Att'y Gen.*, 42 F.4th 1266 (11th Cir. 2022); *Pierre v. United States Attorney General*, 879 F.3d 1241 (11th Cir. 2018). With the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), *Chevron* has been displaced, casting doubt on previous statutory interpretation decisions resting on *Chevron* deference. So too here. I nevertheless defer to my

21-11416          MIDDLEBROOKS, J., Concurring          2

colleagues on the question of whether the Eleventh Circuit's prior decision in *Pierre*, effectuated through the doctrine of statutory *stare decisis*, dispositively answers the interpretive problems raised in this matter. I agree that following *Loper Bright*, the question is far from settled. I write separately, however, to observe that even if this case were not governed by *Pierre*, Mr. Bastias's deportation would still be proper on a *de novo* reading of the INA. That is, the "best reading" of the statute confirms Mr. Bastias was convicted of a "crime of child abuse." *Loper Bright*, 144 S. Ct. at 2266.

## I

To uncover the best reading of the INA, we must look to Congress's intent as effectuated by the statutory text. *Leocal v. Ashcroft*, 543 U.S. 1, 8 (2004). Here, the disputed phrase, a "crime of child abuse, child neglect, or child abandonment," lacks a congressionally sanctioned definition, and so we must use the ordinary tools of statutory interpretation to divine its meaning. *Loper Bright*, 144 S. Ct. at 2268. This case is abnormal, however, as 8 U.S.C. § 1227(a)(2)(E)(i) does not concern just any ambiguity, but turns on the critical word "crime," which both Parties agree captures a "single category" of offenses that "encompasses the entire phrase." Respondent's Supp. Brief at 8; Petitioner's Supp. Brief at 6 n.3. Where Congress fails to define a federal crime, courts must clarify its contours and supplement the statute's text using the so-called "categorical approach." *Taylor v. United States*, 495 U.S. 575, 588 (1990).

21-11416          MIDDLEBROOKS, J., Concurring                    3

Under the categorical approach, a court will ignore the particulars of the defendant's conduct, and instead apply a two-step statutory analysis. First, the court must fashion its own "generic" definition of the federal crime at issue, which "reflect[s] the 'cluster of ideas' behind the terms Congress actually used." *Ibarra v. Holder*, 736 F.3d 903, 914 (10th Cir. 2013) (quoting *Morissette v. United States*, 342 U.S. 246, 263 (1952)). The Supreme Court has instructed that at this stage, a court should uncover the "contemporary meaning" of the crime using relevant sources, such as legal dictionaries, other federal statutes, and contemporaneous state criminal codes. *See Taylor*, 495 U.S. at 596. Next, the court asks whether the state statute under which the defendant was convicted "categorically fits" the generic definition of the federal crime. That is, the court must determine whether the statute's "least culpable conduct necessary to sustain a conviction" would satisfy the elements of the generic federal offense. *Daye v. U.S. Att'y Gen.*, 38 F.4th 1355, 1361 (11th Cir. 2022) (quoting *Zarate v. U.S. Att'y Gen.*, 26 F.4th 1196, 1199 (11th Cir. 2022)).

## II

Here, the first step of the categorical approach is simplified by the nature of the Parties' dispute. The Parties both agree that under Florida Statute § 827.03(2), the least culpable conduct necessary to sustain a conviction is governed by section (d). The provision states that "[a] person who willfully or by culpable negligence neglects a child without causing great bodily harm, permanent disability, or permanent disfigurement to the child

21-11416          MIDDLEBROOKS, J., Concurring          4

commits a felony of the third degree."[1] Fla. Stat. § 827.03(2)(d). Petitioner cites three reasons why Florida Statute § 827.03(2)(d) does not categorically fit the "crime" of child abuse, neglect, or abandonment Congress meant to render deportable in 1996. First, Petitioner claims that as Congress intended, a crime of child abuse, neglect, or abandonment requires some harm or injury to befall the child, whereas Florida Statute § 827.03(2)(d) requires no such injury for criminal liability to attach. Second, Petitioner contends that Florida Statute § 827.03(2)(d) targets criminally negligent conduct using the phrase "culpable negligence," whereas Congress intended for the INA to embrace only crimes committed with a mens rea of recklessness or greater. Finally, Petitioner insists Florida Statute § 827.03(2)(d) extends to many potential adult offenders, whereas a crime of child abuse, neglect, or abandonment is misconduct by only a parent or guardian. These three contentions culminate in Petitioner's ultimate thesis, that "negligent, non-injurious conduct by someone without a legal duty akin to a parent or guardian" falls outside the meaning of "child abuse." Petitioner's Brief at 1. Petitioner's thesis is unpersuasive.

A

To begin, the generic definition of a "crime of child abuse, neglect, or abandonment" is not cabined to only injurious conduct. The plain text of 8 U.S.C. § 1227(a)(2)(E)(i) specifies the crime may be one of child abuse, neglect, or abandonment. "Because 'a crime

[1] Under Florida law, a conviction for a third-degree felony carries a "term of imprisonment not exceeding 5 years." Fla. Stat. § 775.082(3)(b)(2)(e).

of child abuse, child neglect, or child abandonment' represents a single category of crimes—crimes of child abuse—the intended sweep of the term must be broad enough to encompass all three of the listed offenses: abuse, neglect, and abandonment." *Cruz v. Garland*, 101 F.4th 361, 365 (4th Cir. 2024). While the concept of "abuse" may readily conjure the image of a harmed child, one can "neglect" or "abandon" a child without causing tangible injury. Both are kinds of deprivation, which need not always graduate into harm. As the Fourth Circuit explained, "it is not necessary for a child to have been actually harmed. One can engage in abandonment or neglect by creating a substantial risk of harm to the child due to lack of supervision or protection. . . . This requisite risk of harm to a child fully effectuates Congress's intent to single out those who have been convicted of maltreating or preying upon children." *Cruz*, 101 F.4th at 365 (quoting *Matter of Aguilar-Barajas*, 28 I. & N. Dec. 354, 359 (BIA 2021)) (internal quotation marks omitted).

This intuitive account of a "crime of child abuse" is reflected in contemporary legal dictionaries. Although some dictionaries in 1996 defined "child abuse" as intentional cruelty to a child, *see* Black's Law Dictionary at 239 (6th ed. 1990), others clarified that "maltreatment of a child, esp. by beating, sexual interference, or neglect" was sufficient, Oxford English Dictionary at 114 (2d ed. 1989). Moreover, "child neglect" was defined as the "failure on the part of a parent or parental substitute to supervise a child and provide requisite care and protection," Webster's II New College Dictionary at 194 (1995), and "child abandonment" was a "failure

21-11416          MIDDLEBROOKS, J., Concurring          6

to communicate with or provide financial support for one's child over a period of time that shows a purpose to forgo parental duties and rights," Merriam-Webster's Dictionary of Law at 1 (1996). *See also Diaz-Rodriguez v. Garland*, 55 F.4th 697, 713–15 (9th Cir. 2022) (collecting sources). The majority of dictionary sources thereby do not require conduct to harm a child to be classified as neglect or abandonment, as the operative phrases employed, such as "maltreatment" and "failure . . . to supervise," may be readily applicable without proof of actual injury.

Finally, the holding of *Pierre* reinforces the conclusion that the federal definition of "crime of child abuse" does not require actual injury or harm. While Petitioner correctly observes that *Pierre* did not decide whether a "crime of child abuse" embraces purely negligent acts, *Pierre*, 879 F.3d at 1250 n.3, *Pierre did* expressly hold that "child abuse crimes under the INA are not limited to those offenses 'requiring proof of actual harm or injury to the child,'" *id.* at 1250. In so holding, the Court recognized and adopted the Board's reading of child abuse as a "well-recognized legal concept," which must be broad enough "to encompass endangerment-type crimes" in order to accomplish "uniform nationwide application." *Id.* at 1249-50. None of these conclusions are displaced by the fall of *Chevron*, and they retain their persuasive power as evidence of the best reading of the statute. Were the INA constrained to only criminal conduct that resulted in actual injury to a child, swaths of neglectful, abusive conduct may escape the ambit of 8 U.S.C. § 1227(a)(2)(E)(i), an impermissible result in light of Congress's "aggressive legislative movement to expand the

criminal grounds of deportability" for crimes against children. *Id.* at 1249.

B

Next is perhaps the greatest controversy at issue in this case: the mens rea required for the generic federal crime of child abuse. The bare text of 8 U.S.C. § 1227(a)(2)(E)(i) does not itself provide a mens rea, but appears to refer only to the grounds for criminally culpable actus reus: abuse, neglect, or abandonment. Where a statute does not supply a mens rea, the Supreme Court has occasionally read into the statute a mens rea of knowledge or intent. *Ruan v. United States*, 142 S. Ct. 2370, 2377 (2022). As other courts interpreting 8 U.S.C. § 1227(a)(2)(E)(i) have found, however, "there is a compelling textual reason not to construe 'crime . . . of child neglect' as requiring either knowledge or intent. The operative term, after all, is 'neglect,' and the relevant offense is the 'crime of . . . child neglect.' 'Nothing' in that language 'indicates that [it] applies exclusively to knowing or intentional' acts or omissions." *Diaz-Rodriguez*, 55 F.4th at 741 (Collins, J., concurring in part and concurring in the judgment) (quoting *Voisine v. United States*, 579 U.S. 686, 692 (2016). The Parties have instead proffered alternative readings of 8 U.S.C. § 1227(a)(2)(E)(i), disputing whether a "crime of child abuse" embraces the lowest culpable mental state: criminal negligence. Whereas Respondent insists the generic federal crime of child abuse captures criminally negligent conduct, Petitioner argues that in 1996 "child neglect required the

21-11416             MIDDLEBROOKS, J., Concurring                8

defendant to have a men rea greater than criminal negligence." Petitioner's Brief at 2.

Ultimately however, both Parties misconstrue the critical inquiry demanded by the categorical approach. The question before us is not whether, in the abstract, the generic federal crime of child abuse requires a particular mens rea. Rather, it is whether there is a categorical fit between the generic federal crime and the *particular* provisions of Florida Statute § 827.03(2)—including the attendant mens rea that accompanies them. Florida Statute § 827.03(2)(d) references two mens rea standards that attach criminal liability: "willfully" and "culpabl[y] negligen[t]." Fla. Stat. § 827.03(2)(d). Neither Party contests that willful—i.e., intentional or purposeful—abusive conduct against children is deportable under 8 U.S.C. § 1227(a)(2)(E)(i). We must therefore determine whether "culpable negligence," as defined in Florida law, is a culpable mental state under the generic federal crime of child abuse.

The meaning of "culpable negligence" itself presents a puzzle of statutory interpretation. The statute does not define culpable negligence, and both Parties have largely proceeded under the assumption that culpable negligence is akin to ordinary criminal negligence. This assumption is not borne out by Florida law. Ordinarily, a "person acts recklessly, in the most common formulation, when he 'consciously disregards a substantial and unjustifiable risk' attached to his conduct, in 'gross deviation' from accepted standards." *Borden v. United States*, 593 U.S. 420, 427 (2021) (quoting Model Penal Code § 2.02(2)(c); *Voisine*, 579 U.S. at 694).

21-11416          MIDDLEBROOKS, J., Concurring          9

Conversely, "a person acts negligently if he is not but 'should be aware' of such a 'substantial and unjustifiable risk,' again in 'gross deviation' from the norm." *Borden*, 593 U.S. at 427 (quoting Model Penal Code § 2.02(2)(d)). The key distinction, then, is whether a person's gross deviation reflects a conscious or reckless disregard of a substantial and unjustifiable risk, or merely an unreasonable failure to perceive the risk associated with one's conduct.

For more than eighty years, Florida courts have read "culpable negligence" in a manner that does not quite match either traditional recklessness or classic criminal negligence. "Where the highest court . . . has spoken on the topic, we follow its rule." *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1348 (11th Cir. 2011). Here, the Florida Supreme Court has explained that the standard for culpable negligence is "at least as high as that required for the imposition of punitive damages in a civil action," requiring "a gross and flagrant character, evincing reckless disregard for human life" or an "entire want of care which would raise the presumption of indifference to consequences." *Russ v. State*, 191 So. 296, 298 (Fla. 1939); *see also Preston v. State*, 56 So. 2d 543, 544 (Fla. 1952) ("The 'culpable negligence' required to sustain a manslaughter charge must be of 'a gross and flagrant character, evincing reckless disregard of human life . . . or that entire want of care which would raise the presumption of indifference to consequences.'"); *State v. Green*, 348 So. 2d 3, 4 (Fla. 1977) ("Thus, reckless indifference or grossly careless disregard of the safety of others is necessary to prove 'culpable negligence.'"). The Florida Supreme Court has also at times defined culpable negligence with

21-11416          MIDDLEBROOKS, J., Concurring          10

reference to the standard for recklessness, requiring "reckless disregard of human life or a *conscious indifference* to the consequences." *Behn v. State*, 621 So. 2d 534, 537 (Fla. 1993) (emphasis added).

Across these cases are several consistent requirements, including that the dereliction of care be so egregious as to be tantamount to intentional misconduct. At the very least, the Florida Supreme Court has explained that although the phrase "negligent" is used, "culpable negligence" is a distinct concept[2] comparable to scienter. *See State v. Joyce*, 361 So. 2d 406, 407 (Fla. 1978). While not binding authority, Florida's jury instructions further reflect the divergence between negligence and culpable negligence, explaining that "culpable negligence is more than a failure to use ordinary care for others. . . . Culpable negligence is a course of conduct showing reckless disregard for human life, . . . or such an entire want of care as to raise a presumption of a conscious

---

[2] In fact, the Florida Supreme Court clarified this distinction in the context of a constitutional challenge. In *State v. Winters*, the Florida Supreme Court declared an older child neglect statute, Florida Statute § 827.04(2), unconstitutionally vague. 246 So. 2d 991, 994 (Fla. 1977). There, the statute criminalized "negligent treatment of children," which was held to be too indefinite and overbroad. *Id.* at 993-94. In *State v. Joyce*, however, the Court clarified that Florida Statute § 827.03(2) did not suffer from the same constitutional deficiencies, explaining that whereas the statute in *Winters* "made criminal acts of simple negligence conduct which was neither willful nor culpably negligent," Florida Statute § 827.03(2) required a higher showing of "willfulness (scienter) or culpable negligence." 361 So. 3d at 407. Because culpable negligence was comparable to scienter, the Court explained, the statute employing it did not "suffer from the constitutional infirmity of vagueness." *Id.*

21-11416          MIDDLEBROOKS, J., Concurring          11

indifference to consequences . . . [or] such an indifference to the rights of others as [to be] equivalent to an intentional violation of such rights." Fla. Std. Jury Instr. (Crim) 8.9.

Although the Florida Supreme Court has been relatively consistent with its interpretation of "culpable negligence," lower Florida courts have suffered from greater variance. Whereas some have more or less adopted the standard used by the Florida Supreme Court, *see, e.g.*, *Ibeagwa v. State*, 141 So. 3d 246, 247 (Fla. Dist. Ct. App. 2014) (defining culpable negligence to include "gross or flagrant" conduct showing "reckless disregard of human life," an "entire want of care as to raise a presumption of a conscious indifference to consequences," or such "wantonness or recklessness" as to equal the intentional violation of the rights of others), others have woven in standards that resemble criminal negligence, *see, e.g.*, *Kish v. State*, 145 So. 3d 225, 227–28 (Fla. Dist. Ct. App. 2014) (contending culpable negligence involves conduct a defendant knew or should have known was likely to produce great harm); *Taylor v. State*, 363 So. 3d 126, 130 (Fla. Dist. Ct. App. 2023) (same).

This web of court precedent and jury instructions notwithstanding, what is clear from a survey of Florida sources of law is that culpable negligence cannot be neatly categorized as either recklessness or criminal negligence. While a defendant evidently need not consciously disregard a risk in order to be culpably negligent—the traditional hallmark of recklessness— liable acts qualifying under the standard are so egregious as to be

21-11416            MIDDLEBROOKS, J., Concurring            12

considered akin to intentional conduct, well beyond ordinary criminal negligence. This proximity to intent is further exemplified by the structure of Florida Statute § 827.03(2)(d), as "culpable negligence" is placed alongside "willfully," suggesting some degree of equivalence between the two. *See Ristau v. State*, 201 So. 3d 1254, 1257 (Fla. Dist. Ct. App. 2016) ("[Culpable Negligence is reserved for] only the most egregious conduct, done either willfully or with criminal culpability."). Indeed, in assessing where culpable negligence falls in the hierarchy of criminal mental states, the Florida Supreme Court and the Eleventh Circuit have both suggested culpable negligence may even be above recklessness. *See Smith v. U.S. Att'y Gen.*, 983 F.3d 1206, 1211 (11th Cir. 2020) ("[T]he mens rea required to sustain a conviction for vehicular homicide—recklessness—amounts to more than simple negligence, but less than culpable negligence, which is required to sustain a conviction for manslaughter.") (citing *McCreary v. State*, 371 So. 2d 1024, 2016 (Fla. 1979)).

We need not state definitively whether culpable negligence should be classified as either recklessness or negligence. Rather, we must only decide whether culpably negligent conduct, as described by the Florida courts, satisfies the generic federal definition of child abuse. I think it apparent that it does. Recall that if nothing else, culpably negligent conduct is conduct so egregious and grossly flagrant as to evince a reckless disregard for human life, revealing such a want of care as to raise a presumption of conscious indifference to the consequences. Whether this dereliction of care is predicated on what the defendant should have known or in fact

21-11416                MIDDLEBROOKS, J., Concurring                13

did know, it stands to reason that conduct of such a reckless and egregious nature can readily be classified as "abuse," "neglect," or "abandonment" as Congress understood those terms in 1996.

The case law applying culpable negligence demonstrates as much. In *Taylor v. State*, the court held that a mother's conduct was culpably negligent when she used methamphetamine while supervising her three-week-old baby, which ultimately resulted in the baby's death. 363 So. 3d at 130. In *Ibeagwa v. State*, a mother was also convicted of culpably negligent conduct following the deaths of her two children, aged six and three, who were left home alone, unsupervised, for hours before they eventually drowned in their neighbor's pool. 141 So. 3d at 247-48. These acts of neglect, which were egregious enough to be considered culpably negligent, readily satisfy the contemporary meaning of neglect as captured in the INA. Once again, dictionaries in circulation when the INA was amended in 1996 define neglect as "failure on the part of a parent or parental substitute to supervise a child and provide requisite care and protection." Webster's II New College Dictionary at 194 (1995); *see also* Neglect, Bryan Garner, A Dictionary of Modern Legal Usage 535 (2d ed. 1995) (defining neglect as "the act or condition of disregarding"; "Neglect indicates, as a purely objective fact, that a person has not performed a duty"); Webster's Dictionary of Law at 324 (1996) (defining it as "a disregard of duty resulting from carelessness, indifference, or willfulness; *esp*: a failure to provide a child under one's care with proper food, clothing, shelter, supervision, medical care, or emotional stability").

21-11416             MIDDLEBROOKS, J., Concurring             14

Petitioner's contentions to the contrary are unpersuasive. Much of Petitioner's analysis claims that the INA does not embrace criminally negligent conduct. This is a patently lower bar than culpable negligence, and therefore is inapplicable to the Florida statute. Indeed, as revealed by acts which have been held to not be culpably negligent, there is a sizeable category of conduct which may be criminally negligent, but which does not rise to the level of culpable negligence. In *Kish v. State*, the court found that a mother was not culpably negligent for leaving her three children unattended for several hours, during which time the children developed illnesses that landed them in the emergency room. 145 So. 3d at 226-27. The court explained that despite the children being sick, merely leaving the children unattended—without more—did not rise to the level of egregious conduct needed for culpable negligence to apply. *Id.* at 229.

Even with more troubling fact patterns, the demands of culpable negligence are not readily satisfied. In *Kelley v. State*, the defendant was charged with neglecting a child through culpable negligence after he drunkenly walked a four-year-old child under his care down the middle of a major road. 341 So. 3d at 469-70. Reversing the conviction, the court concluded that "although Kelley's behavior was negligent and irresponsible, it did not constitute 'culpable negligence.'" *Id.* at 469. Moreover, in *Jones v. State*, a father was charged with child neglect after he dropped his six-week-old infant against a bathtub, before waiting eleven hours to finally seek medical attention after the baby began coughing up bloody milk. 292 So. 3d 519, 521 (Fla. Dist. Ct. App. 2020). The child

ultimately suffered permanent injuries and brain damage. *Id.* The reviewing court found even this conduct "[did] not rise to the level of gross of flagrant disregard sufficient to prove [the defendant] acted 'willfully or by culpable negligence.'" *Id.* at 523.

The varying outcomes of culpable negligence cases reveal that, while perhaps imprecise, the standard of culpable negligence is a demanding one. Not just any negligence will do—even when the defendant's conduct would otherwise constitute a criminal deviation from the standard of care, or a failure to perceive a risk they should have known. As such, Petitioner's analysis, which addresses criminal negligence, is unhelpful. For instance, Petitioner expends much ink citing surveys of contemporary state criminal codes for the assertion that a majority of states did not criminalize negligent, non-injurious conduct involving children. Petitioner's Brief at 35-40; *see also Ibarra*, 736 F.3d at 915 ("Only eleven states clearly criminalized non-injurious child endangerment where the culpable mental state was only criminal negligence."); *Diaz-Rodriguez v. Garland*, 12 F.4th 1126, 1135 (9th Cir. 2021) ("[O]nly 14 States criminalized child endangerment committed with a mens rea of criminal negligence.").

The Supreme Court has "made clear that . . . a multi-state survey 'is not required by the categorical approach.'" *Diaz-Rodriguez*, 55 F.4th at 744 (Collins, J., concurring in part and concurring in the judgment) (quoting *Esquivel-Quintana v. Sessions*, 582 U.S. 385, 396 n.3 (2017)). In this case, the surveys Petitioner cites are also not especially persuasive, as even if they are correct,

21-11416          MIDDLEBROOKS, J., Concurring                    16

they do not bear on the particular question before us. Surveys of state law may be a useful tool for discerning the contemporary meaning of statutorily undefined legal terms. Here, however, the Florida statute makes use of a term not found elsewhere in state criminal codes. Culpable negligence is unique to Florida, and so surveys of other state laws, which assess state laws under the lower standard of criminal negligence, cannot inform whether culpable negligence is a categorical fit for child abuse.

Instead, the sources of law that *are* instructive—Florida law and contemporary legal dictionaries—reveal that culpably negligent conduct fits well within the statutory structure of the INA. Indeed, Petitioner may be correct in arguing that "the child-abuse provision is paired with two 'heinous crimes,' which suggests that the child abuse provision, too, 'encompasses only especially egregious felonies.'" Petitioner's Supp. Brief at 13 (quoting *Esquivel-Quintana*, 582 U.S. at 393-94). It would defy common sense to suggest that actions taken against children, which reveal an "entire want of care as to raise a presumption of a conscious indifference to consequences," are not among those especially egregious felonies. *Russ*, 191 So. at 298. Accordingly, no matter how we might classify "culpable negligence" within the traditional hierarchy of culpable mental states, we must conclude that as used in Florida law, culpable negligence captures a category of conduct that is so egregious as to raise a presumption of conscious indifference, which rises to a level of seriousness matching those acts of abuse, neglect, and abandonment Congress meant to render deportable in 1996.

21-11416          MIDDLEBROOKS, J., Concurring          17

C

Finally, Petitioner's claim that only conduct undertaken by a parent or parental substitute can be considered abuse, neglect, or abandonment within the meaning of INA is unavailing. Florida Statute § 827.03(2)(d), which criminalizes "neglect[ing] a child without causing great bodily harm," defines "neglect" to mean "[a] caregiver's failure or omission to provide a child with the care, supervision, and services necessary to maintain the child's physical and mental health." Fla. Stat. § 827.03(1)(e). A "caregiver," moreover, is defined as any "adult household member" or "person responsible for a child's welfare." *Id.* § 827.03(1). Petitioner contends this statutory scope sweeps too far, Petitioner's Supp. Brief at 4-5, 15, asserting that the crime of abuse or neglect necessarily involves the violation of a particular kind of duty, which is only incurred by a parent or guardian.

The INA, as amended in 1996, reveals no such requirement. As contemporary sources demonstrate—and as demanded by common intuition—one may abuse or neglect a child without being the child's parent. It is sufficient, instead, for one to have assumed a supervisory role, such that the child is within their care—thereby assuming the duty to care for that child throughout the duration of their supervision. *See* Webster's II New College Dictionary at 194 (1995) (neglect is "failure on the part of a parent *or parental substitute* to supervise a child and provide requisite care and protection" (emphasis added)); Neglect, Ballantine's Legal Dictionary and Thesaurus (1995) ("The failure to do or perform

21-11416          MIDDLEBROOKS, J., Concurring          18

some work, act, or duty, required by one's status or by law");
Webster's Dictionary of Law at 324 (1996) ("[A] disregard of duty
resulting from carelessness, indifference, or willfulness; *esp*: a
failure to provide a child *under one's care* with proper food, clothing,
shelter, supervision, medical care, or emotional stability"
(emphasis added)).

As Petitioner points out, Florida Statute § 827.03(2) has been
applied to non-parental caregivers before, such as babysitters. *See*
Petitioner's Supp. Brief at 5 (citing *State v. Nowlin*, 50 So. 3d 79, 82
(Fla. Dist. Ct. App. 2010)). This does not strike me as inappropriate.
Nothing in the text, history, or purpose of the 1996 amendments
to the INA suggests Congress intended to shield children from only
parental abuse or neglect. Rather, concepts like abuse and neglect
may apply to all kinds of caregivers because they wield supervisory
power over children, whatever form that power may take or
whatever title may accompany it. It is distinct from, say, the crime
of spousal abuse, which refers specifically to a category of abuse
perpetuated by an aggressor in a romantic relationship with the
abused. Here, the only relevant requirement for the crime of child
abuse is the abuse itself, which is matched by the language of
Florida Statute § 827.03(2).

### III

Having established that the generic federal offense of child
abuse is not confined to injurious conduct, embraces culpably
negligent acts, and may extend to those who are not parents nor
guardians of the victim, it is a fairly straightforward matter to

21-11416               MIDDLEBROOKS, J., Concurring               19

conclude Florida Statute § 827.03(2) is a categorical fit. Under Florida Statute § 827.03(2), the least culpable conduct criminalizes "neglect" by a caregiver, taken either willfully or with culpable negligence—even if said neglect does not result in injury. Given the text and structure of the INA as amended in1996, and upon review of relevant contemporary legal sources, there is little doubt that Congress meant to render deportable acts like those criminalized by Florida Statute § 827.03(2). I do not think it necessary, from this conclusion, to decide whether ordinary criminal negligence falls within the meaning of child abuse, as a criminal negligence statute is not before us. The statute before us is one of a unique and heightened character, attaching only to the most egregious, wantonly reckless conduct that may appear before the state's courts. Such a statute thoroughly accords with the text and aims of the INA, and the best reading of what a "crime of child abuse" entails.